UNITED STATES of America, Appellee,

v.

David HINDS, Defendant, Appellant.

No. 87–1128.

United States Court of Appeals, First Circuit.

Heard July 27, 1988.

Decided Sept. 19, 1988.

---

Barbara A. McCarthy, by Appointment of the Court, for defendant, appellant.

Mitchell D. Dembin, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for appellee.

Before BOWNES, TORRUELLA and NOONAN,* Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant David Hinds appeals his jury conviction of conspiracy to distribute cocaine and possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 2. David Hinds' codefendants Timothy Letren and Grady Milton were also found guilty on both counts. The other indicted defendant, Keith Matthews, entered a guilty plea prior to trial.

There are four issues on appeal: (1) whether the search warrant was invalid because of failure to specify the items to be seized; (2) whether the search conducted was invalid because it covered an area not described in the warrant; (3) whether the

* Of the Ninth Circuit, sitting by designation.

admission of hearsay evidence by coconspirators against defendant was error; and (4) whether the admission of testimony that a gun had been seized during the search violated Federal Rule of Evidence 403.

## I. THE FACTS

This case started on May 22, 1986, when Special Agent Doherty of the Drug Enforcement Administration was introduced to Keith Matthews. Doherty, working as an undercover agent, posed as a cocaine buyer looking for a source of supply. He offered to buy a pound of cocaine. Matthews agreed to the sale and left to get the cocaine. When Matthews returned, he said the deal could not go through because there were police around. He gave Doherty two telephone numbers to call.

A number of telephone calls were made to the numbers, all of which were recorded. On June 4, Doherty talked twice to Matthews' half brother, Timothy Letren, known as Rick. On June 6, Doherty arranged by phone to meet Letren at the Ground Round Restaurant in downtown Boston. At the meeting Letren identified himself as Matthews' half brother. He told Doherty that Matthews was the one to see for buying kilograms (keys) of cocaine, that he sold only ounces and pounds. Doherty gave Letren his beeper number so that Matthews would have it.

Doherty telephoned Matthews on June 10 and asked Matthews to meet him at the Victoria Station Restaurant near the South Station in Boston. Matthews met Doherty and it was agreed that Doherty would buy two kilograms of cocaine at a price of either $31,000 or $32,000 per kilogram. Matthews agreed to give Doherty a sample and they drove in Doherty's car to Matthews' house at 41 Braddock Park in Boston. Matthews went into the house and returned with about two grams of cocaine as a sample.

On June 10, another undercover agent, Bonnie Alexander, who had been introduced to Matthews as a friend of Doherty's, called Matthews to confirm a meeting

at the Westin Hotel to consummate the "buy." Matthews and Letren drove to the hotel. Letren waited outside while Matthews went inside. Matthews and Doherty dickered about the price, which Matthews said had to be higher than previously agreed. There was more negotiating outside the hotel between Doherty and Letren. A price of $35,000 per kilogram was finally agreed upon. Matthews and Letren then drove to the house at 41 Braddock Park. Letren called Doherty and told him everything was set and Matthews was on his way.

Surveillance of 41 Braddock Park by the DEA commenced at about 5:00 p.m. on the same day, June 11. The surveillance team saw Letren and Matthews return to the house at about 6:45. Just before 7:00 p.m. codefendant Grady Milton arrived at the house by automobile. Milton knocked or rang the bell and then returned to his car. A short time later Matthews and defendant Hinds came out of the house. Matthews was carrying a bag containing, as a subsequent analysis proved, one kilogram of cocaine. Both men got into Milton's car and it drove away.

The car arrived at the Westin Hotel a short time later. Matthews went into the hotel and returned with Doherty. Doherty got into the car and sat in the rear seat behind Milton, the driver. Hinds was seated in the passenger's seat in the front. Matthews, who was in the rear seat behind Hinds, opened the bag and showed the cocaine to Doherty. Doherty broke off a piece, ostensibly to take it back to his hotel room for a test. Doherty and Matthews then got out of the car. Matthews left the bag containing the kilogram of cocaine in the car. Doherty gave a prearranged signal and Matthews, Milton and Hinds were arrested. Letren was arrested a short time later at 41 Braddock Park.

After the arrests a warrant was obtained to search the house at 41 Braddock Park. A strainer and metal dish with a glass pulverizer, all of which had cocaine residue on them, and a scale were found in Hinds'

bedroom. In a bathroom next to Hinds' bedroom, there was an empty jar with a lactose label on it. An empty bottle of mannitol and an empty bottle of lactose were found in a trash can in the kitchen, which adjoined the bedroom.[1] Three wet plastic bags with traces of white powder in them were found in the doorway between the kitchen and the bedroom. On analysis, the white powder was found to be cocaine. The final items seized were a five-shot Smith & Wesson revolver and a small box of ammunition. The revolver and ammunition were found between the kitchen stove and the wall behind it.

## II. THE WARRANT

The description in the warrant of the property authorized to be seized was:

Coaine [sic]; cocaine paraphernalia, proceeds from the illegal distribution of cocaine, including United States currency; documents and records showing evidence of the illegal distribution of cocaine and showing ownership or dominion over the above-described premises. All being evidence of violations of title 21, United States Code, Section 841(a)(1).

The question is whether the words "cocaine paraphernalia" are sufficient to describe the items seized from Hinds' bedroom and adjoining kitchen and bathroom. We do not at this time consider the seizure of the gun, which will be treated separately.

■ We reject appellant's contention that this was a general warrant. Broad and general search warrants are, of course, proscribed by the fourth amendment. *See United States v. Roche*, 614 F.2d 6 (1st Cir.1980); *Application of Lafayette Academy, Inc.*, 610 F.2d 1 (1st Cir.1979). Here, the nature of the items to be searched for was sufficiently described by the phrase "cocaine paraphernalia." We find no suggestion in any case that "paraphernalia"— much less "cocaine paraphernalia"—is unduly generic where the nature of the offense, in this case cocaine trafficking, is

---

**1.** It was stipulated at trial that if called to testify, a DEA chemist would state that lactose and mannitol often are used to dilute the purity of cocaine.

clear. It cannot reasonably be argued that cutting agents, scales, a strainer, metal discharge and pulverizer, and plastic bags with cocaine residue are *not* cocaine paraphernalia. In fact, "cocaine paraphernalia" can only include a highly restrictive set of items, and the agents who searched 41 Braddock Park did not engage, in a "general rummaging for evidence." Indeed, appellant concedes in his brief that the agents "knew what were looking for regarding cocaine paraphernalia (*i.e.*, cutting agents, scales)." Appellant's brief, p. 23. There is no suggestion that the agents were searching for items unconnected to the cocaine trade. The term "cocaine paraphernalia" sufficiently described the items seized.

## III. THE SCOPE OF THE SEARCH

Appellant contends that the search of his bedroom and the adjoining kitchen and bathroom was not authorized by the warrant. The warrant description of the premises to be searched is:

> 41 Braddock Park, being a single family 3–story red brick building with white wooden trim, a brown front door which is located at the top of a stair landing on the first floor, said door bearing the numbers 41 in gold color, the entire premises are occupied by Lloyd, Alice, Richard and Keith Letren.

Appellant's argument that the search and seizure exceeded the scope of the warrant can be stated as follows. The building was a four-story house, not three, as the warrant states. The fourth story, which was the one that yielded the "cocaine paraphernalia" was occupied by the Hinds family, not the Letrens. The search, therefore, went beyond the premises described in the warrant.

The fourth amendment requires that a warrant "particularly describ[e] the place to be searched...." This is an important proscription, for it serves to protect the "indefeasible right of personal security, personal liberty, and private property." *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). As we have said before, the authority to search must be limited to places described in the warrant. *United States v. Bonner,* 808 F.2d 864, 868 (1st Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1632, 95 L.Ed.2d 205 (1987); *United States v. Principe,* 499 F.2d 1135, 1137 (1st Cir.1974). "However, search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided.... For example, warrants authorizing a search of 'premises' at a certain address authorize a search of the buildings standing on that land." *Bonner* at 868 (citations omitted). In *United States v. Asselin,* 775 F.2d 445 (1st Cir.1985), we held that "premises" included a disabled cadillac next to a carport, and a birdhouse hanging 15 feet away from the trailer home.

We find appellant's argument unpersuasive for three reasons. First, whether David Hinds lived on the third or fourth floor depends entirely on what is considered as the first floor. The record contains a photograph of 41 Braddock Park. It shows that the building is a brownstone with stairs leading up to the front door from the street. The front door opens on the main level of the premises, and two floors rise above it.[2] The search warrant itself describes accurately the location of the first floor: the "front door ... [is] located at the top of the stair landing on the first floor." Below the first floor is a basement apartment. We agree with the district court that it could reasonably be found that appellant lived on the third floor of the house, which was also the top floor.

We do not think that the mere presence of more than one family in a building automatically changes its character from single family to multifamily. There were no indi-

---

**2.** The photograph was attached to the affidavit of Special Agent Bonnie Alexander in support of the search warrant. In part, the affidavit reads "the front door of the residence ... is barred and apparently not in use. To the side of and below the stairway leading to the front door is a door which leads to a below ground or basement level of the house. There are three stories above that basement level.... I and other agents entered through the basement door.... Each level inside the house is serviced by the same stairway.... There are no doors, locks, buzzers, or other markings separating the top level from the rest of the house."

cations, such as separate doorbells or mail-boxes, that more than one family lived at 41 Braddock Park. Indeed, the top floor on which the Hinds lived was not separated from the floors below by a door, but was openly accessible to anyone in the house. The building was described as accurately as could be reasonably expected.

And finally as the district court pointed out, the "warrant authorized a search of the whole building, whether we call it a three story or four story one." In one of the recorded telephone conversations between Matthews and Doherty, Matthews had told Doherty that he "deals out of the house." We agree with the district court that the warrant description of the premises authorized the search of the top floor of the building, which was occupied by appellant Hinds and his family.

## IV. THE ADMISSION OF THE HEARSAY STATEMENTS

■ Appellant's objection to the admission of hearsay statements made by Letren and Matthews against him is a challenge to the sufficiency of the evidence for his conviction of conspiracy. He contends that the government did not prove that he knew of the conspiracy or became part of it. Appellant points out that until he was seen in the front seat of the car at the time of the arrest, Doherty had no knowledge of him at all. He argues that his presence in the car at the time was just happenstance[3] and that, under the law, mere presence is not sufficient to prove participation in a drug conspiracy. There are three statements to which appellant objects:

1. Letren's statement to Doherty on the telephone at about 7:00 p.m. on June 11, 1986, that everything was set and Matthews was on his way to the hotel;
2. Matthews' statement as he approached Milton's car with Doherty that the people in the car (Milton and Hinds) are friends; and

3. Matthews' conversation with Doherty in the rear of the car in the presence of the appellant regarding the quality of the cocaine in the bag.

If the only evidence against appellant was his presence in the car at the crucial time, the admission of the statements would be a close question. But the damning evidence of the cocaine paraphernalia found in appellant's living quarters on the top floor of 41 Braddock Park makes the issue academic. The facts establish that the building was used as a base for selling cocaine. A thorough search of the entire building was made and, with the exception of one plastic bag with cocaine residue found in Letren's bedroom, all of the paraphernalia used in preparing cocaine for sale was found in that part of the house occupied by appellant.

Appellant's living quarters were not separated in any way from the rest of the house. There was no door blocking the top floor off from the rest of the house. By no stretch of the imagination could appellant be considered to have occupied a private apartment separate and distinct from the rest of the building.

Leaving aside the statements themselves, there was sufficient evidence from which the jury could have found, as it did, that appellant was part of a conspiracy involving Matthews, Letren and Milton, to sell a kilogram of cocaine to Doherty. In addition to the items found in appellant's living quarters and the fact that he lived in a house used as a cocaine store, there was also the following evidence: appellant and Matthews were seen leaving the house together with Matthews carrying a bag containing a kilogram of cocaine; appellant looked continually in the rearview window of the car while Matthews and Doherty were discussing the quality of the cocaine; and Matthews left the cocaine in the car when he and Doherty got out to return to the hotel so that a sample could be tested. Against this backdrop of irrefutable facts,

---

**3.** Appellant testified that he was on the way to the store and Matthews offered to give him a lift.

the hearsay statements pale into insignificance.

"Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances,'" *United States v. Stubbert*, 655 F.2d 453, 456 (1st Cir.1981) (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Nor need a conspirator be aware of all the details of a plan: "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge, of all its details or of the participation of others." *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947) (footnote omitted).

It was not error for the district court, after properly following the procedure required by *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977) and *United States v. Ciampaglia*, 628 F.2d 632, 637–38 (1st Cir.1980), to admit the three hearsay statements for consideration by the jury.

## V. THE ADMISSION OF TESTIMONY ON THE SEIZURE OF THE GUN

As already noted, a .38 Smith & Wesson five-shot revolver and a box of ammunition were found in the kitchen adjoining appellant's bedroom. Appellant claims that testimony of this should have been excluded under Federal Rules of Evidence 403, which provides in pertinent part:

Although relevant, evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice....

The district court held a lengthy bench conference, listened to the arguments of all the attorneys, applied the requisite balancing test and then admitted testimony describing where the gun and ammunition had been found against defendants Hinds and Letren, but not against Milton, the other defendant. The court excluded the gun itself on the ground that it would be unduly prejudicial to admit it.

Absent an abuse of discretion, a district court's determination of admissibility under Fed.R.Evid. 403 will not be disturbed on appeal. *United States v. Gonsalves*, 668 F.2d 73, 75 (1st Cir.), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982); *Dente v. Riddell, Inc.*, 664 F.2d 1, 5 (1st Cir.1981).

*United States v. Cintolo*, 818 F.2d 980, 998 (1st Cir.1987).

We have only to read the daily newspapers or watch the news on television to recognize that narcotic dealing and guns go hand in hand. We agree with the observation in *United States v. Wiener*, 534 F.2d 15, 18 (2nd Cir.1976), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976): "Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." In *United States v. Cresta*, 825 F.2d 538, 554 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988), we noted that in large-scale international smuggling ventures "guns have become tools of the trade almost to the same extent as scales, cutting equipment and other paraphernalia." The district court did not abuse its discretion in allowing testimony describing the seizure of the gun.

*The judgment of the district court is affirmed.*