UNITED STATES, Appellee,

v.

Howard MORRIS, Defendant, Appellant.

UNITED STATES, Appellee,

v.

Rafael TORMES–ORTIZ, Defendant, Appellant.

Nos. 90–1288, 90–1644.

United States Court of Appeals, First Circuit.

Heard July 28, 1992.

Decided Oct. 8, 1992.

Before TORRUELLA and SELYA, Circuit Judges, and ZOBEL,* District Judge.

TORRUELLA, Circuit Judge.

These appeals involve various rulings made by the United States District Court for the District of Puerto Rico with reference to the joint trials of appellants Rafael Tormes–Ortiz ("Tormes–Ortiz") and Howard Morris ("Morris"). Appellant Tormes–Ortiz was convicted of conspiracy to possess marijuana and cocaine, possession of marijuana and cocaine, possession of cocaine with intent to distribute, use of a firearm during the commission of a drug crime, and travel in interstate commerce to possess cocaine. Tormes–Ortiz appeals the district court's denial of three separate motions to suppress and the imposition of a term of special parole for the conviction of possession of marijuana with intent to distribute on November 1, 1989. Appellant Howard Morris was convicted of importation of cocaine. He appeals the district court's denial of three different motions to suppress.

In addition both Morris and Tormes–Ortiz appeal the trial court's denial of a motion challenging the legality of the jury verdict and a motion for a new trial presented by Tormes–Ortiz, and adopted by Morris. In essence the motions challenge the verdict because it is alleged that the jury deliberated in the Spanish language notwithstanding the failure to establish that all the members of the panel were proficient in that language. We consider each of the appeals separately and relate the relevant facts.

Joseph C. Laws, Jr., Hato Rey, P.R., for defendant, appellant Howard Morris.

Arthur Joel Berger, with whom Robert L. Moore, Miami, Fla., was on brief, for appellant Rafael Tormes–Ortiz.

Lena D. Mitchell, Atty., Criminal Div., Narcotic and Dangerous Drug Section, Dept. of Justice, with whom Robert S. Mueller, III, Asst. Atty. Gen., Mary Lee Warren, Chief, New York City, Margaret A. Grove, Deputy Chief, Washington, D.C., and Daniel F. López–Romo, U.S. Atty., Hato Rey, P.R., were on brief, for appellee.

## RAFAEL TORMES–ORTIZ

### Facts

On October 14, 1985, Puerto Rican law enforcement officers executed a search warrant at 739 Ginis Corvalan Street in Cupey, Rio Piedras, Puerto Rico. Officers Cruz–Pérez and Fernández found appellant Tormes–Ortiz in a carport attached to the residence. According to Officer Cruz–Pér-

* Of the District of Massachusetts, sitting by designation.

ez's testimony, Tormes–Ortiz permitted the officers to enter the house after reading the warrant. Once inside the house the two officers found three others, including an unidentified woman. Tormes–Ortiz immediately told the police that the woman had no connection to anything inside the residence or inside the vehicles there, and that everything belonged to him. Except for presenting the search warrant neither officer had spoken with Tormes–Ortiz prior to this statement. Immediately after Tormes–Ortiz made the statement Officer Cruz–Pérez advised him of his Fifth Amendment rights. Tormes–Ortiz replied by saying that he understood these rights as he had been arrested on previous occasions, and offered to turn over everything inside the house to the officers if they would agree not to arrest the woman. Officer Fernández agreed to the offer.

Tormes–Ortiz then directed Officer Cruz–Pérez to the living room where the agent seized a transparent "zip lock" bag containing white powder. He also directed Officer Cruz–Pérez to a bedroom closet from which the agent seized a green trash bag stored inside a carton containing approximately twenty-five pounds of marijuana. From there Tormes–Ortiz directed Officer Cruz–Pérez to a vehicle in the carport from which the officer seized two blocks of compressed white powder. Tormes–Ortiz made *no further statements during this period of time.*

After seizing these items, Officer Cruz–Pérez searched the house and the remaining vehicles without Tormes–Ortiz' help. During that search the officer seized a plastic bag containing powder from another

vehicle as well as some weapons, ammunition, and several transistor radios. Officer Cruz–Pérez then arrested Tormes–Ortiz and the other two men at the residence.

### Standard of Review

■ " '[T]he findings of the district court after a hearing on a pretrial motion to suppress are binding on appeal unless they are clearly erroneous.'" *United States v. Falon,* 959 F.2d 1143, 1146 (1st Cir.1992) (quoting *United States v. McLaughlin,* 957 F.2d 12, 17 (1st Cir.1992)). However, we conduct an independent review of the search warrant to determine the sufficiency of its language. *United States v. Hinds,* 856 F.2d 438, 440 (1st Cir.1988).

### Legal Analysis

I. Motion to Suppress physical evidence obtained pursuant to a search warrant executed on October 14, 1985.

■ Appellant Tormes–Ortiz filed a motion to suppress all physical evidence derived from the search of the residence at Cupey, Rio Piedras, Puerto Rico on October 14, 1985.[1] According to appellant Tormes–Ortiz the warrant was facially invalid because it was overbroad. The warrant describes the property authorized to be seized as:

> ... all that is relating [sic] to drugs and narcotics and any other object that is in violation of the law.

Appellant suggests that this warrant literally allowed the police to search for anything anywhere in the residence, including items that could not be described as "drug paraphernalia."[2] However, both the mag-

---

1. The drugs seized pursuant to this warrant were the basis for the conviction of Tormes–Ortiz on Counts 11 and 12.

2. The following items were seized from the residence occupied by defendant:
 1. A cardboard box with the inscription "Samsung" containing a plastic bag, green in color, containing marijuana in its interior.
 2. A small transparent "zip lock tight" (yellow and blue border) plastic bag containing a white powder.
 3. A large transparent "zip lock tight" (yellow and blue border) plastic bag containing a white powder.

4. Two solid, white "blocks" wrapped with yellow tape inside a transparent "zip lock tight" (yellow and blue border) plastic bag wrapped in yellow tape.
5. A carbine cal. 30–30, Winchester, with serial number ECMP9117, brown and black in color.
6. A brown bundle containing one black 9 m.m. Smith & Wesson, series A–34, 1944, and its [illegible]. Also, eight (8) rifle "pins"; a fire extinguisher; an innumerable number of different caliber bullets.
7. One "Communications Specialists" transistor radio bearing serial number 06437.

istrate and the trial court rejected appellant's facial attack on the warrant. Insofar as "drugs and narcotics" are concerned, we agree.

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and *particularly describing the place to be searched and the persons or things to be seized.*" (Emphasis added). U.S. Const. amend. IV. In requiring a particular description of articles to be seized, the Fourth Amendment " 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *United States v. Fuccillo,* 808 F.2d 173, 175 (1st Cir.1987) (quoting *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965)). Unfettered discretion by the executing officer is one of the principal evils against which the Fourth Amendment provides protection, and thus warrants which lack particularity are prohibited.

■ General descriptions in warrants, however, have been accepted when the surrounding circumstances render it reasonable. *See, e.g., United States v. Cortellesso,* 601 F.2d 28 (1st Cir.1979) (general description upheld due to practical impossibility of precise description); *Vitali v. United States,* 383 F.2d 121 (1st Cir.1967) (general description permissible due to common nature of items to be seized). In *United States v. Klein,* 565 F.2d 183 (1st Cir.1977), we set forth a two-part test which in particular circumstances helps to determine whether the warrant satisfies the requirements of the Fourth Amendment in this respect. First, we consider the degree to which the evidence presented to the magistrate establishes reason to believe that a large collection of similar contraband is present on the premises to be searched. Second, we consider the extent to which, in view of the possibilities, the warrant distinguishes or provides the executing agents with criteria for distinguishing the contraband from the rest of an individual's possessions. Applying these factors in *Klein,* we held that a search warrant authorizing the seizure of certain 8-track electronic tapes and tape cartridges which were unauthorized "pirate" reproductions in violation of the copyright laws was invalid because it provided only a generic description of the goods to be seized from the retail store which was to be searched. Both the affidavit and the warrant in *Klein* failed to establish that there was a large collection of contraband in the store and failed to explain the methods by which the executing officers could differentiate any contraband from the rest of defendant's possessions. This information could have been easily made available to the magistrate without undue burden on enforcement personnel, but was not.

Both factors in the *Klein* test are met in this case. The magistrate was presented with an affidavit describing two separate drug transactions which had been observed at 739 Ginis Corvalan Street, one involving cocaine, and the other involving marijuana. In both transactions, the drugs came from the house at the above cited address so that there was sufficient evidence to believe that a large collection of similar contraband would be present in the premises that were to be searched pursuant to the warrant. Further, all the facts related in the supporting affidavit were included in the warrant itself.[3] Thus, the executing officers were aware that the underlying offense was the illegal trafficking of co-

8. One "Sea Lab 9000" transistor radio, bearing serial number 5015958.
9. One "ICOM" transistor radio, bearing serial number 31226.
10. One "ICOM" transistor radio, bearing serial number 31801.
11. One "Citizens" transistor radio, bearing serial number 511059.
12. One "Citizens" transistor radio, bearing serial number 508130.

13. One "Communications Specialists" transistor radio bearing serial number 01985.
14. One "ICOM" radio charger (battery) bearing serial number 38056.

3. An affidavit may be referred to for purposes of providing particularity if the affidavit accompanies the warrant, and the warrant uses suitable words of reference which incorporate the affidavit. *Klein,* 565 F.2d at 186, n. 3.

682

caine and marijuana, and that they were looking for cocaine and marijuana, and anything else related to the trafficking of those drugs.[4] This is clearly not a case where, insofar as drugs and narcotics are concerned, the executing officers were left with unfettered discretion as to what they could seize. The officers in fact seized amounts of cocaine and marijuana from the searched premises. Accordingly, we find that the police properly seized the cocaine and marijuana found in the house, and that the district court did not err in denying appellant's motion to suppress.

■ We note that while the amounts of cocaine and marijuana were validly seized under the first part of the warrant, the catch-all phrase authorizing seizure of "any other object in violation of the law" is impermissibly broad. However, in cases where a search warrant is valid as to some items but not as to others, we have established that a court can admit the former while excluding the latter. *United States v. Díaz*, 841 F.2d 1, 4 (1st Cir.1988) (search warrant which allowed impermissible seizure of some items without probable cause and properly allowed seizure of other items, was not entirely invalid) (citing *United States v. Riggs*, 690 F.2d 298 (1st Cir. 1982)). Application of this principle is appropriate in this case because, of the items seized, only the cocaine and marijuana were introduced into evidence at trial.[5] The district court's refusal to suppress the evidence in question is thus affirmed.

## II. Statements made during the search of October 14, 1985.

■ Appellant Tormes–Ortiz also sought to exclude from evidence certain oral statements which he made to the police during the search of October 14, 1985. According to the testimony of a member of the Puerto Rico police force present the day the search warrant was executed, Tormes–Ortiz ad-

mitted that everything in the house and in the vehicles in the carport belonged to him. Also, after a compromise was reached with the police pursuant to which the police agreed not to arrest the only woman present in the house at that time, Tormes–Ortiz showed the police where various amounts of cocaine and marijuana were stored. According to appellant these statements were involuntary, although he fails to substantiate this claim.

One of the police officers who executed the warrant testified that Tormes–Ortiz permitted the officers to enter the house after reading the warrant. Once inside the house the two officers found three other persons including an unidentified woman. Tormes–Ortiz immediately and spontaneously told the police that the woman had no connection with anything inside the residence or inside the vehicles nearby, and that everything belonged to him. Except for presenting the search warrant neither officer had spoken with Tormes–Ortiz prior to his volunteering this information. Immediately after Tormes–Ortiz made the statement officer Cruz–Pérez advised him of his Fifth Amendment rights, and Tormes–Ortiz replied by saying that he understood these rights as he had been arrested on previous occasions, and offered to turn over everything inside the house to the officers if they would agree not to arrest the woman.

Appellant cites two cases in support of his argument: *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), where defendant was threatened with the loss of her children unless she cooperated with the police; and *Harris v. South Carolina*, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949), where defendant was threatened with the arrest of his mother unless he agreed to confess to a crime. Contrary to these two cases, however, the police here did not arrive at the house of Tormes–Ortiz

**4.** *See Hinds,* 856 F.2d at 440–41 (phrase "cocaine paraphernalia" not unduly generic where the nature of underlying offense—cocaine trafficking—is clear).

**5.** During the search the officers seized, in addition to amounts of cocaine and marijuana, a

number of weapons and transistor radios. However, these items were excluded from evidence pursuant to Rule 403 of the Federal Rules of Evidence, thus mooting the district court's ruling in this respect on the motion to suppress.

and announce to him that either he surrender all possible incriminating evidence or face the arrest of his wife. Rather, the compromise here was proposed voluntarily by appellant himself to the police. The police made no attempt to coerce appellant into making statements he did not want to make. On the contrary, appellant was well aware of his rights, both because he had been arrested on previous occasions, and because the police had just reminded him of them. Nevertheless, he proposed a compromise to the police which they readily accepted. We find no misconduct on the part of the police in accepting what was offered freely by appellant. And no error was committed by the trial court's admission of appellant's voluntary statements during the search.

III. Motion to suppress all evidence obtained pursuant to arrest on June 23, 1988.

Shortly after midnight on June 23, 1988, Officer Pedro González–Serrano of the Puerto Rico Police was patrolling the San Sebastián district when he noticed an airplane flying overhead without lights. He followed the course of the plane visually, and observed that it flew towards an abandoned airstrip in the Calabasas section of the town of San Sebastián. Officer González–Serrano was aware that aircraft carrying "drug cargo" had landed at that airstrip on previous occasions.

Thus, the officer proceeded towards the airstrip, and observed the plane land from a distance of two to three hundred feet. He then went to the entrance of the airstrip where he heard male voices expressing a need to hurry and the possibility of being caught by the police in the area. By this time several other law enforcement officers had arrived at the scene in response to radio contacts that officer González–Serrano had initiated when he first saw the aircraft. As they approached the runway in two vehicles one or more persons fired a semi-automatic or an automatic weapon at them and shone a light in their direction. The officers returned fire, and a few minutes later other officers arrived at the scene. By the time the officers

reached the runway, however, the persons at the airstrip had fled.

As the police searched the airstrip officer González–Serrano observed a white, twin-engine airplane with its nose tipped and hitting the edge of the runway. Across from the airplane and outside the right edge of the runway were "drums similar to fuel containers." The airplane's door lay open with the stairs extended, and there were noticeable footprints on the stairs. Police Sergeant Pratts–Piñiero, who arrived at the runway with the officer, observed several duffel bags that contained what appeared to be packages of cocaine. A brown briefcase sealed with a combination lock lay on top of the plane until United States Customs Service Special Agent Jusino arrived. Agent Jusino assumed and maintained custody of the briefcase until he gave it to Drug Enforcement Administration ("DEA") Special Agent Norman Heath later that afternoon.

Tall grass and dense vegetation surrounded the airstrip. Officer González–Serrano followed two trails leading away from the airstrip. One of these was a trail of vehicle tires which passed through the area from which the gunfire had come earlier. As the officer progressed downhill the trail led to an overturned black Chevrolet van. Inside the cabin of the van he saw a revolver and a semi-automatic or automatic weapon, and some clothing. When he opened the back of the van he observed several wrapped, sealed, and labelled sacks. Sergeant Pratts–Piñiero also arrived at the site of the van and saw that the sacks were similar to those in the airplane. Customs Agent Jusino noticed upon his arrival that the van also contained a small suitcase with tags that read "H. Morris," "HL Morris," and "Howard L. Morris."

It had rained heavily the previous day, and in the moist ground Officer González–Serrano was able to distinguish footprints of tennis shoes and regular-soled shoes going away from the van. He followed these footprints through an area of thick bushes to an unpaved road that intersected the highway to San Sebastián. Officer González–Serrano returned to the airstrip shortly

before dawn. His clothing was wet and muddy and he had scratches on his body from following the trail through the bushes. He asked the local police and bus drivers to advise him if they saw unknown persons wearing wet and muddy clothing, and with visible scratches.

Thereafter, the police received a phone call from a resident of San Sebastián who had been approached by a man from out of town who wore wet and muddy clothing. Officer González–Serrano attempted unsuccessfully to locate the person so described. However, around 8:00 A.M., a person identifying himself as a public transportation worker called the police station and reported that two strangers in dirty clothing and displaying scratches were cleaning off in a puddle of water near the bus terminal at the town square. Officer González–Serrano and other police officers then drove to town where they were stopped and told by two local bus drivers that the men they sought were on a street by the town square. Based on this information, officer González–Serrano went to the town square at approximately 8:25 A.M.

Although there were approximately twenty to thirty-five persons in and around the town square, officer González–Serrano immediately noticed that only two were dressed in muddy and extremely wet clothing. The two were also wearing tennis shoes. One of the two was sitting on a bench in the square and had visible scratches on his face and arms. In response to officer González–Serrano's inquiry, he answered that he was not from San Sebastián, at which time he was placed under arrest. This person was later identified as Logroño–Cruz. The other, later identified as appellant Tormes–Ortiz, was using a public telephone a few feet away from Logroño–Cruz. As the officer was arresting Logroño–Cruz, the latter repeatedly glanced toward Tormes–Ortiz. Observing this, Officer González–Serrano ordered the arrest of Tormes–Ortiz. Several documents and a pager were seized from Tormes–Ortiz' person.

Appellant Tormes–Ortiz argues that the arresting officer lacked probable cause to carry out his arrest without a warrant. Therefore, appellant maintains that any evidence obtained as a result of his arrest should have been suppressed.

The constitutionality of a warrantless arrest "depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Probable cause is determined under an objective standard, *United States v. Figueroa,* 818 F.2d 1020, 1023 (1st Cir.1987), and the government need not show "the quantum of proof necessary to convict." *Id.* Moreover, probability, and not a prima facie showing of criminal activity, is the standard of probable cause. *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983). We must also keep in mind that probability should not be reduced to a neat set of rules, but assessed according to the particular factual context. *Figueroa,* 818 F.2d at 1024.

■ Within this legal framework we must now examine the circumstances surrounding Tormes–Ortiz' arrest in June, 1988. We note again that the findings of the district court are binding unless clearly erroneous. *United States v. Wiseman,* 814 F.2d 826, 828 (1st Cir.1987).

Here the arresting officers undertook a lengthy and weary search for the drug offenders who had fired at them earlier in the night. While it is true that the officers never actually saw any of the offenders clearly, they did follow them through an area of heavy vegetation that was also quite muddy from the recent rainfall. When they returned from their pursuit, they were wet, muddy and had cuts on their arms and faces from rushing through the bushes and trees. Thus, it was reasonable for the officers to expect that whomever they were looking for would also be wet, muddy, and have cuts on his/her arms

and face from having traversed the same path as the officers. Moreover, it was quite reasonable to expect that these individuals would be in the San Sebastián area as their vehicle had over-turned and they were forced to escape on foot. In addition, from the prints left behind in the mud, the police knew that at least one of the offenders would be wearing tennis shoes. Thus, when the officers found appellant Tormes–Ortiz in the town square of San Sebastián, in an area where public transportation is available to leave town, in muddy clothing and wet, with cuts and scratches on his arms, and wearing tennis shoes, they had ample probable cause to believe that he was one of the individuals they had pursued earlier that night. We also note that more than one town native had already singled out the defendant as a stranger, and possibly one of the individuals the police were looking for. Looking at the totality of the circumstances, sufficient probable cause existed for Tormes–Ortiz' arrest, and therefore, we find no error in the district court's denial of appellant's motion.

## IV. The Jury Deliberations.

Appellant Tormes–Ortiz argues that he was denied due process of law because the jury deliberations in his case allegedly took place in Spanish. According to appellant's motion challenging the legality of the verdict, at or around 7:30 P.M. on Thursday, September 28, 1989, the day jury deliberations took place, defense counsel inadvertently overheard jurors speaking Spanish while in the room where deliberations were being conducted. However, counsel could not say whether at the time the jurors were deliberating, eating or engaged in both activities. What is clear is that counsel did not object to the jury deliberations at that time. Instead, he waited until after jury deliberations were completed, the jury was polled, and the verdict was recorded to challenge the verdict. In his motion appellant argued that there was no evidence before the court suggesting that all jurors were fluent in Spanish, and thus, there was no guarantee that all jurors had properly participated in the deliberations. Based on these contentions, appellant submits that

jury deliberations were carried out in violation of 28 U.S.C. §§ 1861, et seq., and thus, that said deliberations constitute a denial of appellant's due process rights. Defense counsel also requested an evidentiary hearing based on the same allegations to determine whether deliberations had taken place in English or in Spanish.

The trial judge denied both motions in a written order, ruling that there could be no evidentiary hearing because Rule 606(b) of the Federal Rules of Evidence barred such an inquiry of the jurors. Further, the trial court found that whether jurors deliberated in English or Spanish was of no legal consequence. We affirm the district court on different grounds.

According to appellant's counsel, he became aware of the potential impropriety on or around 7:30 P.M. in the evening that jury deliberations began. However, he chose not to make an objection or take any action on his suspicions until after the verdict was in, approximately five hours later. We have held that a defendant who becomes aware of juror misconduct prior to the rendering of the verdict but fails to inform the court before the conclusion of deliberations, waives the right to complain about such conduct after an adverse verdict. *United States v. Costa*, 890 F.2d 480, 482 (1st Cir.1989). Other circuits have followed this same reasoning. The Fourth Circuit has held that absent "exceptional circumstances" which compromise the integrity of the deliberations, a new trial should not be granted where the movant fails to raise a timely objection to the alleged impropriety. *Cooper v. Dyke*, 814 F.2d 941, 949 (4th Cir.1987). Similarly, the Eleventh Circuit has held that a defendant cannot learn of juror misconduct during trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was influenced by that misconduct. *United States v. Bolinger*, 837 F.2d 436 (11th Cir. 1988); *see also United States v. Dean*, 667 F.2d 729, 732–34 (8th Cir.1982) (en banc) (untimely notification of juror misconduct waives right to new trial even where actual prejudice can be shown); *Moore's Federal*

*Practice*, (1991) § 59.08(1), pp. 78–79. The present situation is indistinguishable. Appellant failed to raise the issue claimed in a timely and appropriate manner. Moreover, the jury was polled following the reading of the verdict and counsel for Tormes–Ortiz was satisfied with the results, as every juror agreed with the guilty verdict. We will not allow counsel to stand by quietly and gamble on a favorable verdict, only to complain when it turns out to be otherwise. Thus, as we assess no miscarriage of justice on the part of the district court in denying appellant's motion, its decision is affirmed.

## V. The Sentence.

■ Count 28 of the indictment charged appellant Tormes–Ortiz with importation of marijuana on November 1, 1986, a substantive drug offense. During trial, a witness testified that the marijuana in question was imported on October 31, 1986 or November 1, 1986. At sentencing the trial judge imposed a term of special parole for the conviction on count 28.

After the sentencing in this case took place, the Supreme Court held that a term of supervised release, not special parole, is to be imposed for substantive drug crimes committed after October 27, 1986. *Gozlon–Peretz v. United States*, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991). Consequently, appellant charges that this portion of the sentence is illegal.[6] Appellant further submits that although this issue was not raised below, it is appropriate for this Court to grant relief, rather than subject the appellant and the lower court to a collateral relief proceeding. *Bartone v. United States*, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963).

According to the Supreme Court's interpretation of § 1002 of the Anti–Drug Abuse Act of 1986, 21 U.S.C. § 841(b)(1)(A), Congress intended for courts to impose a term of supervised release, and not special parole, for all those offenses committed in the interim period between October 27, 1986, and November 1, 1987, and falling within the categories specified by § 1002.

*Gozlon–Peretz*, 498 U.S. at ——, 111 S.Ct. at 849. We thus vacate that portion of appellant's sentence imposing a term of special parole, and remand to the district court for resentencing in accordance with this opinion.

## HOWARD MORRIS

### Facts

Later in the day that Tormes–Ortiz was arrested in 1988, Officer González–Serrano heard that a man had offered a law enforcement official one hundred dollars for transportation from San Sebastián. Based on this information, the officer and others went to the Piedras Blancas Ward of San Sebastián where they arrested appellant Morris at approximately 3:25 P.M. At the time, Morris wore white pants, a shirt, and shoes that were muddy. He also had scratches on his right arm—a fact which also contributed to the officer's decision to arrest him.

When Officer González–Serrano began to advise Morris of his Fifth Amendment rights he realized that Morris did not understand Spanish. Therefore, he had a second officer, Officer Santiago, advise Morris of his rights in English. The police seized Morris' wallet, address book, a pilot's license, some documents indicating his recent travel to Colombia, and $1,600 in cash. Morris was then taken to see DEA Special Agent Norman Heath at the airstrip.

Agent Heath, who was accompanied by a United States Department of Justice trial attorney, introduced himself to Morris. The agent advised Morris of his Fifth Amendment rights. The trial attorney emphasized to Morris that he would not be threatened but that any statements he made would be used against him. Thereafter the agent told Morris that a piece of his luggage had been seized at the scene but Morris denied any involvement. When the agent confronted him with the piece of luggage and some other documents Morris decided to cooperate. The agent then advised Morris of his rights again. Each

---

**6.** We note the government's agreement as to the unlawfulness of the sentence.

time Morris indicated that he understood verbally or by nodding his head or both.

During the conversation the agent asked Morris two more times if he understood his rights, and Morris indicated that he did. Morris then admitted that he and two other persons had flown the airplane from Fort Lauderdale, Florida to Guajira, Colombia on June 22, 1988. In Colombia cocaine was loaded onto an airplane which they flew back to San Sebastián. Because of some mechanical problems during the landing, the plane crashed at the airstrip. Morris and the two parties left the airplane and got into a pickup truck to leave the area. The driver of the truck drove so erratically that Morris and the others exited the vehicle and fled on foot. Morris, whose wallet contained a pilot's license, stated that the $1,600 represented payment for expenses incurred during his part in the cocaine importation venture.

As previously indicated, a briefcase belonging to Morris was recovered from the airplane. Agent Jusino testified that he opened the briefcase in San Juan on June 27, 1988, shortly after Agent Heath had obtained Morris' consent. Agent Heath testified that, although Morris told him the combination to the briefcase at the airstrip, he did not open it there. Agent Heath also testified that he thought someone had opened the briefcase in San Sebastián.

### Legal Analysis

#### I. The Arrest.

Appellant argues that the facts of this case can lead only to the conclusion that his arrest was invalid, for appellant was standing at an establishment drinking a soda when the police, without asking any questions, arrested him. According to appellant, the government failed to present any evidence at trial that would indicate that the officers had probable cause for his arrest. *Draper v. United States*, 358 U.S. 307, 310–11, 79 S.Ct. 329, 331–32, 3 L.Ed.2d 327 (1959).

■■■ Counsel for appellant admitted at oral argument that this issue was not argued before the district court, and thus is being heard for the first time on appeal. It

is well established that issues not addressed to the district court will not be considered by this court in the first instance except in "extraordinary circumstances." *United States v. Drake*, 673 F.2d 15, 19 (1st Cir.1982). Thus, unless appellant's argument is "so compelling as virtually to insure appellant's success," this court will not entertain his argument. *See Hernández–Hernández v. United States*, 904 F.2d 758, 763 (1st Cir.1990) (quoting *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979)). Such is not the case. Morris was found near the area where a number of crimes had occurred recently, manifesting signs of a person who was probably involved in those crimes.—muddy and wet clothing, scratches on his body, looking desperately for transportation out of town. The circumstances surrounding appellant's arrest can hardly be said to point to a manifest injustice by our refusal to open the door to this belated argument for the first time on appeal. As the arresting officers did not act unreasonably, appellant's appeal is denied.

#### II. Motion to suppress statements made subsequent to arrest.

Morris filed a motion to suppress all statements made to the police subsequent to his arrest. Appellant alleges that he was interrogated by police officers for two and a half hours straight, while handcuffed, surrounded by armed officers, and without being allowed to sit. In addition, Morris argues that he continuously asked for a lawyer, but the police failed to provide him with one. He also claims that he was not given an opportunity to call for advice or retain his own lawyer. Thus, he suggests that all statements made by him subsequent to his arrest should have been suppressed as they were involuntarily made in violation of the Fifth Amendment.

The district court heard testimony from two government witnesses and the defendant on this issue. In the last instance, there was an issue of credibility, and it is clear from the trial court's denial of defendant's motion that the court believed the testimony of the government witnesses on

this point and not that of the defendant. The court is entitled to weigh the evidence before it and rule accordingly. *United States v. Cetina–Gómez*, 951 F.2d 432, 434 (1st Cir.1991). We will not substitute our judgment for that of the trial court unless we find that it is clear error. From the record before us we cannot say that such is the case here. A DEA agent, who interrogated appellant at the air strip testified that he read Morris his Miranda rights twice, and reminded him of them another two times throughout the questioning, and that Morris did not ask to have an attorney present and instead voluntarily answered the questions posed. Moreover, a Justice Department trial attorney testified that he was present at the beginning of the questioning, and that Morris was properly informed of his Miranda rights and that he answered questions without asserting his right to have an attorney present. On the other hand, Morris himself took the stand at the hearing and testified that he did not recall making any statements to the government, and that he answered all question by asking for an attorney. The district court could very well have disbelieved Morris' version relying on demeanor and other subjective criteria. We find no clear error in the trial court's decision.

III. Motion to suppress all physical evidence obtained from the seized briefcase.

According to appellant Morris the district court should have suppressed all evidence derived from the briefcase seized from the airplane found at the airstrip as there were no exigent circumstances to justify a warrantless search of its contents. Searches conducted outside the proper judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment subject only to a few specifically es-

tablished exceptions. *California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). The existence of probable cause will not negate the need for a search warrant unless one of the exceptions to the warrant requirement is applicable. *United States v. Panitz*, 907 F.2d 1267, 1271 (1st Cir.1990); *United States v. Cruz Jiménez*, 894 F.2d 1, 5 (1st Cir.1990); *United States v. Cresta*, 825 F.2d 538, 553 (1st Cir.1987), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). However, a determination of whether probable cause or exigent circumstances existed will be unnecessary if a defendant voluntarily consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Patrone*, 948 F.2d 813, 815–16 (1st Cir.1991). Whether a defendant has voluntarily consented will be determined from a totality of the circumstances.

 Police officers testified that Morris himself consented to the search of the briefcase in question. It is clear from the trial transcripts that Morris did in fact voluntarily give the police officers the combination to his briefcase. It is difficult to imagine any other purpose for giving that combination than to open the briefcase and examine its contents. Moreover, during his testimony at the hearing of the motion to suppress, Morris stated: "I was told that they would get a court order to open it anyway so I just went ahead and told them that they could go ahead and open it to prevent damage to the briefcase, yes, sir." [7] In addition, Morris signed a consent form. Accordingly, the district court found that Morris had voluntarily consented to the search of the briefcase. In light of Morris' testimony, and the circumstances related at trial we cannot say that the district court clearly erred in determining that appellant voluntarily gave the police the combination to the briefcase, and in

---

7. *See United States v. Tutino*, 883 F.2d 1125 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990) (it was not coercive for agent to advise owner of house being searched that agents were in the process of obtaining a search warrant); *United States v. Whitworth*, 856 F.2d 1268 (9th Cir.1988), *cert.*

denied, 489 U.S. 1084, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989) (officer's statement indicating that a search warrant would likely be sought and the mobile home secured could not have, by itself, rendered defendant's consent involuntary as a matter of law).

fact consented to its search. *See Patrone,* 948 F.2d at 816 (defendant was deemed to have consented to search where defendant when asked if officers could search his trunk said "alright" and handed over the keys).

Appellant attempts to establish—albeit poorly—that the briefcase was opened before Morris consented to its search. The only evidence appellant cites in support of this allegation is the testimony of agent Heath who stated that he thought the briefcase might have been opened at the site of the aircraft. The district court found no evidence to support this charge. After a thorough review of the record, neither do we. The briefcase was secured with a combination lock and showed no signs of being forced. This is a clear indication that the briefcase was opened only after the combination was obtained from Morris. The decision of the district court is affirmed.

### IV. The jury deliberations.

Appellant Morris adopted appellant Tormes–Ortiz's motions challenging the validity of the verdict and petitioning a new trial on the grounds that the jury deliberated in Spanish. As appellant Morris did not learn of the alleged misconduct until after the verdict was rendered, he had no opportunity to object to the deliberations before the verdict was recorded, and thus did not waive this issue as did appellant Tormes–Ortiz. Therefore, we consider the merits of appellant Morris' appeal.

■ Having examined the language of 28 U.S.C. § 1861 *et seq.,* we fail to find support for appellant's argument—nothing stated in this statute, implicitly or explicitly, requires that federal jurors *deliberate* in English. Rather, all of the requirements listed by Congress pertaining to federal jurors have to do with the juror's ability to understand the *proceedings in court.* Section 1865(2) specifically requires jurors to read, write and understand the English language. 28 U.S.C. § 1865(2). This statute deals principally with the requirement of qualifications for federal jurors, not with their actions during trial. Nowhere in the statute are jurors instructed as to what language they must use when deliberating. Furthermore, the legislative history of this statute clearly demonstrates that Congress' principal concern in enacting this statute was that federal jurors meet the constitutional requirement that they represent a fair cross-section of the community from which they were drawn. 28 U.S.C. § 1861.

Nevertheless, in an abundance of caution, we consider whether there is any other evidence indicating that appellant was denied his right to a fair trial. The only evidence cited by appellant is a statement by appellant Tormes–Ortiz' counsel to the effect that he overheard Spanish being spoken in the jury room around 7:30 P.M. Counsel is not able to say what he overheard, nor can he say what the jurors were discussing, but he insists that the jurors were speaking Spanish. Moreover, counsel admits that the jury could have been having dinner since he smelled food in the area at the time, i.e., counsel could not say with certainty that the jury was in fact deliberating at the time. Based solely on this limited incident appellant asserts that he is entitled to a new trial. He cites no other indicia of alleged irregularity during deliberations. Against this evidence we have that throughout the six or so hours of jury deliberations not one juror came forward with any allegation of irregularity or complaint regarding the deliberation process, or any claim of his/her inability to understand or participate in the deliberations. We add to this that when the jury was polled after the verdict was recorded, each juror affirmed the verdict and made no allegations of impediment during deliberations.

■ A juror's acceptance of the verdict upon polling constitutes prima facie evidence of his/her participation in deliberations, lack of irregularity therein, and concurrence in the outcome, and said verdict should not be disturbed absent extraordinary circumstances, not present in this appeal. *See Jacobson v. Henderson,* 765 F.2d 12, 15 (2d Cir.1985). In *Jacobson* the court held that the defendant was not de-

nied his right to a fair trial by a juror's alleged screaming, hysterical crying, fist banging, name calling, use of obscene language, and throwing of a chair during jury deliberations. The court reasoned that since each juror upon being polled affirmed the verdict, and the complaining jurors had several opportunities to communicate directly with the court if any of them felt unfairly coerced, harassed, intimidated or felt themselves in physical danger, and there was at least a one to two hour interval between the chair-throwing incident and the verdict, there was no valid basis for concluding that the jury was influenced by any external or internal means or that defendant was denied his right to a fair trial. *Id.*

■ It is clearly established that the extent and type of investigation to be conducted pursuant to a motion for a mistrial charging jury misconduct or irregularity is left to the discretion of the trial court. *United States v. Anello*, 765 F.2d 253, 259 (1st Cir.1985). We will not disturb the trial court's decision here neither to alter the verdict, nor to not conduct a post-verdict investigation beyond the polling of the jury, unless we find that the court abused its discretion. We find no abuse of discretion on the part of the district court, and affirm its decision.

*The defendants' convictions are affirmed. Their sentences are likewise affirmed, except for the sentence imposed on defendant Tormes–Ortiz on Count 28. That sentence is vacated and the matter remanded for resentencing.*