# United States Court of Appeals
## For the First Circuit

No. 11-1302

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH JENKINS,
a/k/a Joseph White, a/k/a Joseph Cruz, a/k/a Christopher Bunch,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,*
and Boudin, Circuit Judge.

J. Hilary Billings, Assistant Federal Defender, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

May 23, 2012

---

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** This appeal challenges a traffic stop, an ensuing warranted search of the detained van, and a sentence imposed under the Sentencing Guidelines for possession of a firearm by a felon. We affirm on all issues.

On the morning of March 18, 2010, Maine State Trooper Robert Cejka was patrolling a stretch of Interstate 295 between Brunswick and Gardiner, Maine, accompanied by his daughter, a college student interested in criminal justice. Around 11 o'clock, after stopping a pickup truck for speeding, he was walking back to his cruiser when he saw an approaching minivan with what he believed to be a glinting blue light, like those mounted on or behind the windshields of some police cars. Because Maine law prohibits this kind of light on civilian vehicles, see Me. Rev. Stat. Ann. tit. 29-A, § 2054(2)(D)(4), Cejka gave chase and pulled up behind the van with his siren going.

The driver, defendant Joseph Jenkins, did not pull over immediately, but continued on for another 39 seconds, covering half a mile. During that time Cejka saw Jenkins make a number of motions to his right, reaching in front of the passenger seat and behind it, while tapping his brakes several times as the van weaved to the left. His eventual halt in the breakdown lane was abrupt.

Jenkins's unusual behavior led Cejka to order him to place his hands outside the driver's side window, to be sure that Jenkins was not armed. When Cejka looked inside, he saw a

-2-

television screen on the dashboard playing a movie, but in place of a blue light there was a large blue suction cup attached to the windshield (used as a mount for an electronic device), and a blue handicap placard hanging from the rearview mirror. The back of the mirror was chrome, and Cejka supposed that light glinting off it might have illuminated the cup or the placard.

Jenkins was talking on a cell phone as the officer approached, and when Cejka asked about his furtive motions, Jenkins said he had dropped the phone, picked it up, and called his wife to tell her that he was being pulled over by the police. Jenkins demonstrated his explanation by reaching between his legs and pulling out a DVD remote control, apparently meaning to show that he had dropped his phone down there. Cejka found the story implausible, since he had seen Jenkins reaching over to the passenger seat, where it was unlikely in any event that he had dropped his phone.

When Cejka asked for Jenkins's driver's license and registration, he replied that he had left them at home. When asked for another form of identification, Jenkins produced a white postcard with the name "White" on it and a Standish, Maine address, and told Cejka he was Joseph White, born in 1966. Because Jenkins appeared nervous, Cejka asked him if he had any outstanding arrest warrants. Jenkins said no.

Cejka entered the "Joseph White" information in his cruiser's computer, but found no match in the Maine Department of Motor Vehicles database. After Jenkins supplied more false information and eventually admitted that he did not have a valid license, Cejka arrested him for driving without a license and took him to a nearby jail, where he refused to be fingerprinted and produced more fiction. Cejka left to apply for a search warrant and, while working on the application for it, got a call from the jail informing him that the driver had finally identified himself as Joseph Jenkins and admitted that he was wanted for kidnapping in New Mexico. A Maine judge issued a warrant to search the van, where Cejka and other troopers found a 9mm pistol and holster, clips of ammunition, and a marijuana roach in the ashtray.

Jenkins was charged with the federal offense of unlawfully possessing a firearm following a felony conviction. 18 U.S.C. § 922(g)(1). When the district court denied his motion to suppress the evidence seized in the van, he pleaded guilty, with right to appeal on the legality of the search. The court took a prior conviction for kidnapping in New Mexico to be a crime of violence and accordingly set Jenkins's base offense level at 20 under the Sentencing Guidelines, leading to a 36-month prison sentence.

On appeal, Jenkins argues for suppression of the evidence from the van on three grounds: first, Cejka lacked reasonable

-4-

suspicion to justify pulling the van over; second, Cejka had no basis for continuing to detain the van once he knew there was no blue light; and third, the warrant authorizing the search of the van failed to describe with particularity the contraband to be seized. Jenkins also challenges his sentence, contending that kidnapping in New Mexico is not a "crime of violence" justifying an enhanced sentence under the Sentencing Guidelines.

I

A traffic stop is constitutional if an officer has a reasonable suspicion of unlawful conduct involving a motor vehicle or its operation, United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001), but Jenkins says that Cejka's suspicion that the van carried an illegal blue light was unreasonable. He points out that the van was visible to Cejka for only three seconds before it passed him, and that during that time Cejka twice looked over his shoulder at the pickup truck he had just stopped, leaving only a second or fraction of a second to see any blue object in the van, which turned out to have no blue light.

But there is no reason to second-guess the district court in finding that a police officer who momentarily spotted a large blue disc behind the windshield of a vehicle on an interstate highway could reasonably suspect a violation of Maine's law against civilian blue lights. However briefly Cejka may have observed the approaching van, the resemblance of the blue suction cup to a blue

light[1] and the other things behind the windshield that may have enhanced the suggestion (the blue handicap placard and the glinting chrome rearview mirror), could perfectly well have sparked suspicion. We agree that it was reasonable, and Cejka could of course stop the van to get a better look. See, e.g., United States v. Trueber, 238 F.3d 79, 91-92 (1st Cir. 2001).

Jenkins falls back to serial challenges to Cejka's credibility, ranging from an imputation of vanity (maybe he wanted to impress his daughter) to emphasis on minor variations in his testimony (he said both that he "thought" and that he "believed" he saw a blue light). These add up to nothing, as against the credibility judgment that was up to the district court, which found Cejka believable after reviewing several photos and the video and audio recordings of the incident. There is no clear error in the court's determination, which is not undercut by the fact that Cejka was mistaken; his "mistake [of fact] [need only have been] objectively reasonable." United States v. Coplin, 463 F.3d 96, 101 (1st Cir. 2006).

II

Next, Jenkins contends that Cejka's authority to detain him ceased along with any reasonable suspicion of illegal conduct,

---

[1] We defer to the district court's findings regarding the suction cup, though we hardly need to. A photograph of the van's windshield in the record reveals a blue suction cup about the size and appearance of a circular blue light.

once he saw there was no blue light.  See United States v. Cook,
277 F.3d 82, 85 (1st Cir. 2002) (the scope and duration of a
vehicle stop must be "reasonably related to the circumstances that
justified the interference in the first place").  But reasonable
suspicion did not vanish at that point, for interest in a blue
light had by then been supplemented by suspicion of more serious
criminal activity.[2]  Cejka had ample grounds for suspecting that
Jenkins was trying to hide evidence of something unlawful going on,
most likely transporting drugs or other contraband.  He began to
act questionably as soon as Cejka signaled him to stop the van.
Instead of pulling right over, as most drivers would, he continued
on for another half mile, swerving and tapping the brakes before
coming to a sudden stop.  During this evasion, he appeared to reach
over to the passenger side of the van, as though he were hiding
something under the seat or behind it, or reaching for a weapon.
"These furtive actions gave the officer[] reason to suspect . . .
criminal activity was afoot."  United States v. Martinez-Cortes,
566 F.3d 767, 771 (8th Cir. 2009); see United States v. Moorefield
111 F.3d 10, 12-14 (3d Cir. 1997) (suspect's "furtive hand
movements and refusal to obey the officers' orders constituted

---

[2] Cejka mistakenly believed that driving while watching
television was a violation of Maine law, but Maine's "operation of
a motor vehicle while distracted" statute requires another traffic
infraction at the same time.  See Me. Rev. Stat. Ann. tit. 29-A,
§ 2118.  Driving while distracted by a dashboard television, then,
cannot provide a basis for Cejka's continuing investigation.

suspicious behavior"). Jenkins gave implausible explanations for his suggestive moves, and his responses to Cejka's routine request for identification, see Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186 (2004), pointed to fear of exposure. He was nervous and shaking, he handed Cejka a postcard with only an address and the name "White" on it in lieu of an operator's license, and none of the identifying information he gave matched anyone in Maine's motor vehicle registry. After Jenkins responded that he was licensed in "Arizona," and Cejka pressed him about that, Jenkins admitted that he had last been licensed there as a minor and so owned up to driving without a valid license, the offense for which Cejka arrested him. Every step of this investigation was supported by reasonable suspicion of criminal activity, and with every step the suspicion grew. The roadside detention prior to disclosure of probable cause to arrest had reasonable and articulable support throughout.

III

Although Jenkins does not challenge his arrest here, he unrealistically complains that the warrant to search the van was unsupported by probable cause, and he also charges that it failed to describe the things to be seized with sufficient particularity. As to probable cause, our business as a reviewing court "is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record

-8-

supporting the [judge's] decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984). As is obvious already, the supporting evidence here was ample. Cejka's affidavit recounted Jenkins's reluctance to pull over, his furtive movements consistent with hiding contraband, his repeated attempts to deceive Cejka as to his identity, his eventual admission that he had lied and had no valid driver's license, his continued attempts at deception after arriving at a local jail, his refusal to be fingerprinted, and his eventual admission of his true identity and the existence of outstanding felony warrants. Transporting contraband was by far the most likely explanation for this narrative of strange behavior and concealment, which inarguably justified the finding of probable cause to authorize the search for illegal weapons and drugs.

Jenkins goes on to argue that the authorization to search for "contraband to include weapons, firearms, explosives or illegal drugs" is too general a description of the things to be seized from the van to pass constitutional muster under the Fourth Amendment. As he sees it, the police were required to establish probable cause as to a specific type of contraband, rather than the four types of potential contraband listed in the warrant, which in turn should have been equally specific in "particularly describing" the place and objects of the search. U.S. Const. amend. IV.

Fourth Amendment law does not support him. The warrant in this case is no commission to fish for whatever the police may catch. It allows a search only of one specific place, the mini-van, and the seizure only of illegal drugs or weapons found there. This is not a case with a description embracing the entire gamut of possible unlawful possession, see United States v. Morris, 977 F.2d 677, 682 (1st Cir. 1992) (while police had probable cause to suspect that a house contained cocaine and marijuana, "the catch-all phrase authorizing seizure of 'any other object in violation of the law' [was] impermissibly broad"). Nor is it one where the contraband nature of the object of the search could not be recognized by sight and the government failed to explain how it would "differentiate . . . contraband from the rest of defendant's [property]." United States v. Klein, 565 F.2d 183, 188 (1st Cir. 1977) (analyzing a warrant to seize pirated tapes from a music store).

While "weapons" is inexact it is not implicated in the actual seizure here, given the specific listing of "firearms" as subject to seizure, see Morris, 977 F.2d at 682, and there is no claim that it affected the scope of the search. Nor did the conclusory description of drugs as "illegal" give the police unreasonable leeway. Where, as here, the existence of contraband was likely but knowledge of the precise type of contraband was practically impossible to obtain, probable cause to believe that

-10-

"contraband" including "firearms, explosives or illegal drugs" would be found was sufficient. See Morris, 977 F.2d at 681; Spinelli v. United States, 382 F.2d 871, 886 (8th Cir. 1967) ("When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking."), rev'd on other grounds, 393 U.S. 410 (1969). As Jenkins would have it, he could have told Cejka "I am transporting an extremely large amount of contraband in my van," and the police could not have obtained a warrant to search it, because he declined to pinpoint the subject of his illegal possession. The Warrant Clause is not as rigid as that; reasonable cause is sufficient for a search, and reasonableness is the standard for the required specificity in a warrant. Morris, 977 F.2d at 681.

Finally, even if the warrant were deficient (contrary to our understanding), it could hardly be called so overbroad (or lacking in probable cause) "as to render official belief in its [validity] entirely unreasonable." United States v. Leon, 468 U.S. 897, 923 (1984). Because "a reasonably well trained officer" would not have known "that the search was illegal despite the [judge's] authorization" in the warrant, id. at 922 n.23, Leon's good-faith exception to the exclusionary rule would support admission of the evidence found in Jenkins's van.

-11-

IV

Under the United States Sentencing Guidelines, a felon-in-possession crime carries a base offense level of 20 if the defendant's prior felony conviction was for a "crime of violence." U.S. Sentencing Guidelines Manual § 2K2.1(a)(4)(A). "Crime of violence" is defined for this purpose as

> "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

Id. § 4B1.2(a).

The authoritative and controlling commentary[3] on this guideline provides that "'Crime of violence' includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling." Id. § 4B1.2, cmt. (n.1). To know whether a defendant's prior crime is sufficiently like a similarly named "crime of violence" under the Guidelines or commentary, we look at each offense categorically, that is, "in terms of how the law

_____

[3] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

-12-

defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." Begay v. United States, 553 U.S. 137 (2008). Here, the question is whether New Mexico's kidnapping statute requires proof of all the elements of the standard or "generic" kidnapping offense assumed by the commentary listing (so as to qualify as a crime of violence), or whether that state's statute covers conduct outside generic kidnapping (and thus possibly not classifiable as violent under the Guidelines). See, e.g., Taylor v. United States, 495 U.S. 575, 598 (1990).

> New Mexico defines kidnapping in these terms:
>
> Kidnapping is the unlawful taking, restraining, transporting, or confining of a person by force, intimidation or deception, with intent:
> (1) that the victim be held for ransom;
> (2) that the victim be held as a hostage or shield and confined against his will;
> (3) that the victim be held to service against the victim's will; or
> (4) to inflict death, physical injury or a sexual offense on the victim.

N.M. Stat. Ann. § 30-4-1. Jenkins argues that the statute covers non-violent conduct outside the bounds of a typical kidnapping offense, and he points to the Information used to charge him, which states that Jenkins "unlawfully took Corey Langford by force, intimidation or deception, intending to hold Corey Langford for service against his will, inflict death, or physical injury against Corey Langford." Jenkins contends that the offense he was charged

-13-

with could be committed non-violently by deceiving someone to accompany him merely to do some act for the perpetrator's benefit, which would qualify as "hold for service" kidnapping under the New Mexico statute. See State v. Ortega, 817 P.2d 1196, 1211-1213 (N.M. 1991) (approving a jury instruction stating that "one is held to service when he or she is made to submit his or her will to the direction and control of another" and describing the requisite purpose of holding for service as "to accomplish some goal that the perpetrator may view as beneficial to himself or herself").

As we understand this argument, it mistakes the question before us. That question is whether the New Mexico statute confines kidnapping within the bounds of the generic definition of that offense. If it does, the enquiry stops there. Now it may well be that some elements of an offense that is named as categorically violent may be proven by showing acts of varying degrees of overt force; adding pinches of arsenic to a victim's breakfast oatmeal seems less violent than riddling his body with machine gun bullets, but it still is murder when the victim dies, and still categorically a crime of violence under the commentary that mentions murder as one such crime. If, therefore, an indictment charges the commission of a state offense having a definition that falls within the generic definition of an offense specifically named, it is irrelevant that the indictment may be proven by one of the quieter alternative means

-14-

of commission sufficient under both the state and generic definitions.

We conclude that the New Mexico statutory offense fits within the generic definition of "kidnapping," one of the crimes specifically listed as violent in the Guidelines commentary. In coming to this conclusion, we start, like the briefs on both sides, with the standard definition of kidnapping set out in United States v. De Jesus Ventura, 565 F.3d 870, 875-879 (D.C. Cir. 2009), where the court found that "nearly every state kidnapping statute includes two common elements: (1) an act of restraining, removing, or confining another; and (2) an unlawful means of accomplishing that act." Id. at 876. The court added a third, derived from the Model Penal Code and a slim majority of States (including New Mexico), requiring "a criminal purpose beyond the mere intent to restrain the victim," such as ransoming the victim for a reward or using the victim as a hostage. Id. at 876-77.

We have no reason to doubt the soundness of the De Jesus Ventura analysis, and New Mexico's kidnapping statute checks all three boxes of this generic definition. "[T]aking, restraining, transporting or confining . . . a person, by . . . deception," N.M. Stat. Ann. § 30-4-1, satisfies the first two requirements: (1) restraining another (2) by unlawful means, as an example of which deception is a paradigm, expressly listed in the Model Penal Code and in many state statutes. See Modal Penal Code § 212.1 ("A

-15-

removal or confinement is unlawful within the meaning of this Section if it is accomplished by force, threat or deception . . . ."); see also, e.g., Va. Code Ann. § 18.2-47(A) (kidnapping accomplished by "force, intimidation or deception"); Ohio Rev. Code Ann. §§ 163.225, 163.215 (kidnapping when "taking or confinement is accomplished by . . . deception").

The third element (additional nefarious purpose for the restraint) is met by the New Mexico statute's four listed objects of required intent (ransom; hostage; involuntary service; death, physical injury, or sexual offense). N.M. Stat. Ann. § 30-4-1. While Jenkins argues that holding for service (at least when the original "taking" is by deception) falls outside the generic "nefarious purpose," the argument forgets that the New Mexico statute speaks of holding for service "against the victim's will." Holding for service is thus clearly akin to the other malicious purposes listed in the Model Penal Code and the majority of state statutes, like holding for ransom, or facilitating "commission of a felony or flight thereafter." Model Penal Code § 212.1. And this is just what New Mexico's Supreme Court has concluded, that holding for service "should be construed to effectuate the same overall scheme as . . . holding for ransom and as a hostage—namely, to accomplish some goal that the perpetrator may view as beneficial to himself or herself." Ortega, 817 P.2d at 1212. Accord United States v. Soto-Sanchez, 623 F.3d 317, 324 (6th Cir. 2010) (hold for

service kidnapping "fit[s] within the generic, contemporary meaning of the offense").

Because kidnapping under New Mexico's statute, including kidnapping by deceit with the purpose of holding someone for service, is "kidnapping" as generically listed in the Sentencing Guidelines Manual § 4B1.2, cmt. (n.1), that is the end of the matter. It is a "[c]rime of violence" under the Guidelines and the district court correctly set Jenkins's base offense level at 20.

**Affirmed.**