USCA1 Opinion

 

 April 25, 1995 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1039 UNITED STATES, Appellee, v. WILLIAM RODRIGUEZ, Defendant - Appellant. ____________________ No. 93-1040 UNITED STATES, Appellee, v. ELVIS MATOS, Defendant - Appellant. ____________________ No. 93-1225 UNITED STATES, Appellee, v. JOSEPH TORRES, Defendant - Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ John C. Doherty, by Appointment of the Court, for appellant _______________ William Rodr guez. Eileen M. Donoghue, by Appointment of the Court, for ____________________ appellant Elvis Matos. George L. Garfinkle, with whom Jeffrey A. Denner, James P. ___________________ __________________ ________ Brady and Perkins, Smith & Cohen, were on brief for appellant _____ ________________________ Joseph Torres. Geoffrey E. Hobart, Assistant United States Attorney, with __________________ whom Donald K. Stern, United States Attorney, and George W. Vien, _______________ ______________ Assistant United States Attorney, were on brief for appellee. ____________________ ____________________ Per Curiam. Appellants Joseph Torres, William Per Curiam. ____________ Rodr guez, and Elvis Matos each appeal their convictions for conspiring to possess cocaine with intent to distribute and for possession with intent to distribute. Torres' principal challenge to his conviction is that the district court committed reversible error when it denied his renewed motion for severance. Torres also argues that he is entitled to a new trial because the district court improperly admitted certain co-conspirator statements against him. Rodr guez and Matos both claim that the evidence was insufficient to support their convictions. Matos also asserts that the district court erroneously denied his motion to suppress evidence seized incident to his arrest. All appellants also challenge their sentences, contending that the district court erred in its drug quantity determinations. For the following reasons, we affirm appellants' convictions and sentences. BACKGROUND BACKGROUND We view and present the evidence in the light most favorable to the government. United States v. Abreu, 952 F.2d _____________ _____ 1458, 1460 (1st Cir.), cert. denied, __ U.S. __, 112 S. Ct. 1695, ____ ______ 118 L.Ed.2d 406 (1992). The investigation of this case centered on the undercover work of Drug Enforcement Agency Task Force Agent Mart nez. During the course of this investigation, Agent Mart nez purchased four ounces of cocaine from David Thomas on October 18, 1991 and November 1, 1991, respectively, and a half- kilogram from Thomas on November 8, 1991. The investigation -3- culminated on January 17, 1992 when defendant Abelardo Cuevas delivered ten kilograms of cocaine to Agent Mart nez. A. The January 17, 1992 Transaction A. The January 17, 1992 Transaction ________________________________ On the morning of January 17, 1992, Mart nez and Cuevas spoke on the telephone, and agreed to conduct the transaction in the parking lot of a Friendly's restaurant in Peabody, Massachusetts. In anticipation of the transaction, government agents established surveillance in several areas. At approximately 8:00 a.m., police officers observed appellant Torres pick up Cuevas in a brown Cadillac registered to Thomas, and drive away. Approximately 45 minutes later, a state trooper saw Torres and Cuevas pull up to the access code box at the gate of North Shore Self Storage. Torres used the access code assigned to appellant William Rodr guez to open the security gate. Torres and Cuevas then entered the storage facility. Approximately one minute later, the trooper saw an older blue Toyota station wagon pull up to the access code box. Although the officer observed that this car was occupied by two Hispanic males, he was forced to look away when the two men looked directly at him. Consequently, Trooper Dern was unable to identify the men. The driver of this car, however, used Appellant Rodr guez' access code to open the security gate and enter the storage grounds, and the officials conducting the investigation concluded that these men were Rodr guez and appellant Matos. Five minutes later, Torres and Cuevas exited the storage grounds in the brown Cadillac. Approximately three -4- minutes later, the blue Toyota station wagon exited the grounds as well. Both Torres and the driver of the blue station wagon used Rodr guez' access code to open the gate when they left the premises. Ten minutes later, agents observed Torres and Cuevas enter the parking lot of a Friendly's restaurant in Peabody. A few minutes later, Agent Mart nez arrived in his undercover vehicle. The three men met briefly outside the restaurant. During this meeting, Cuevas introduced Torres to Mart nez as his "socio," the literal translation of which is "associate."1 _____ Torres, Cuevas, and Mart nez then entered the restaurant and discussed the mechanics of the ten-kilogram transaction. Torres stated that he did not like the location and proposed completing the transaction in an apartment, a proposal Mart nez rejected. Torres then stated that they had to be careful, because they were talking about ten kilos, not one or two. In this same discussion, Torres indicated that he had a three kilogram delivery to make later that day in Dorchester. After some further conversation about the details of the transfer, Cuevas instructed Torres to retrieve the cocaine. Torres then left in the brown Cadillac. After Torres left the parking lot, he drove south on a highway for a short time, then suddenly exited the highway and reversed his direction. After driving north for a short  ____________________ 1 Appellant Torres contends that in Caribbean Spanish, "socio" is a colloquial term meaning "buddy" or "cousin." -5- distance, he drove into a strip mall, parked the Cadillac and went to the trunk area of the car for a few seconds. According to the toll records obtained for the cellular telephones subscribed to Torres and Cuevas, Torres contacted Cuevas at or about the time he reversed direction on the highway. After this contact, Torres returned to the Friendly's restaurant, and met again with Mart nez and Cuevas inside. Torres and Cuevas informed Mart nez that they would not complete the transaction there. After Mart nez complained about the sudden change of plan, Cuevas agreed to complete the deal in an hour at Weylu's Restaurant in Saugus, Massachusetts. The three men then left, at about 10:30 a.m. After Cuevas and Torres left the parking lot, they drove to an area near the Northgate Shopping Center in Revere, Massachusetts. At approximately 10:55 a.m., an agent observed Torres driving the brown Cadillac, alone, south to Chelsea, Massachusetts. Torres parked the Cadillac in front of 20 Lawrence Street. At approximately 11:15 a.m., Torres came out of the residence carrying a white shoulder bag. Agents were unable to maintain surveillance of Torres after that. At 11:30 a.m., agents observed a 1977 blue BMW, driven by appellant Rodr guez, moving slowly down the exit road of the Weylu's Restaurant. Appellant Matos was seated in the front passenger seat. After driving down the exit road, Rodr guez and Matos drove slowly through the lower parking area past several parked cars, including a DEA surveillance van. As Rodr guez -6- drove past the van, both Rodr guez and Matos looked into the van, and then parked behind it. Rodr guez and Matos remained there for about five minutes. At about 11:34 a.m., Rodr guez received a page from Cuevas. Immediately after Rodr guez received this page, agents observed Rodr guez and Matos drive away, going north on the highway. The agents did not follow. Approximately ten minutes later, Mart nez drove up to the front entrance of Weylu's. As Mart nez arrived, Cuevas walked up to his car and got in. Once inside Mart nez' vehicle, Cuevas indicated that he wanted to leave the area immediately. Mart nez, however, parked his car near the front entrance of the restaurant. After Mart nez had parked, Cuevas informed him that he had noticed two suspicious-looking vans in the lower parking lot, and explained that, because of his concern about these vans, he had removed the drugs from the area. As the two men were walking toward the restaurant entrance, Cuevas explained that the cocaine had been moved to the Kowloon Restaurant, a short distance away, and asked Mart nez to drive there to pick it up. Once inside Weylu's, Mart nez demanded that the transaction be completed there, and Cuevas agreed. He told Mart nez that he needed to contact his men to have the cocaine brought back to Weylu's. After Cuevas said this, Mart nez observed Cuevas using his cellular telephone to contact these men. According to the toll records obtained for Cuevas' cellular phone, Cuevas paged Rodr guez at 11:55 a.m. and again at 12:03 -7- p.m. When Rodr guez failed to respond to these pages, Cuevas returned to Mart nez' table and explained that he was having difficulty reaching his men. Cuevas then pleaded with Mart nez to travel to the Kowloon Restaurant to pick up the cocaine. Mart nez explained that he could not complete the transaction at the Kowloon because he did not have the purchase money with him. Mart nez and Cuevas then agreed to pick up the cocaine at the Kowloon and then return to Weylu's. At 12:15 p.m., while Mart nez and Cuevas were still inside Weylu's, Rodr guez and Matos returned to the Weylu's parking lot in the blue BMW. They drove directly to the upper parking area adjacent to the restaurant. At approximately 12:30 p.m., Mart nez and Cuevas left Weylu's and entered Mart nez' car. Almost immediately after, Rodr guez and Matos were observed running from the drive-through area of the restaurant to their car. They got in their car and drove rather quickly after Mart nez' car. At the bottom of the exit road, Rodr guez and Matos pulled up behind Mart nez and Cuevas, and then followed Mart nez' car onto the highway. Once on the highway, Cuevas adjusted Mart nez' rear-view mirror so that he, not Mart nez, had a better view of traffic behind them. When Mart nez and Cuevas entered the parking lot of the Kowloon Restaurant, Rodr guez and Matos followed them into the lot as well. In the parking lot, Cuevas left Mart nez' car, went to -8- the blue Toyota station wagon parked there and retrieved a gym bag containing ten kilograms of cocaine. After retrieving the cocaine, Cuevas returned to Mart nez' car and the two men returned to Weylu's. While he was waiting at a table to get paid for the cocaine, Cuevas was placed under arrest. As Cuevas was retrieving the cocaine from the blue Toyota, Rodr guez and Matos watched from the blue BMW. When Mart nez and Cuevas left the Kowloon parking lot, Rodr guez and Matos pulled onto the highway and followed them. They were followed by agents in the same surveillance van that had drawn the attention of Rodr guez and Matos earlier that morning. Rodr guez and Matos drove north for a distance and then reversed direction. After driving south a short distance, they pulled over to the side of the road and allowed the surveillance van to pass them. After the van passed them, Agent Geibel, the van's driver, pulled the van into a parking lot and parked there. A short time later, Rodr guez and Matos drove by the lot slowly, looking at the van as they passed. Instead of continuing, however, Rodr guez and Matos pulled into the parking lot of a gas station, where they waited for about five minutes. When Rodr guez and Matos exited the station parking lot, Agent Geibel also pulled out and followed them. Geibel then followed them into the parking lot of a Sears store. After parking their car, Rodr guez and Matos entered the Sears store through the front entrance. A few minutes later, -9- they exited the building through the rear entrance. As the two men were walking along the side of the building, Rodr guez and Matos again looked at the surveillance van. Rather than returning to their car, they reentered the store through a side entrance. A few minutes later, they exited the store from the front, and Rodr guez walked to a nearby public telephone. Rodr guez was then arrested. According to the cellular telephone records obtained for Torres' cellular telephone, Torres placed a page to Rodr guez at or about the time that Rodr guez walked to the payphone. As Rodr guez was being arrested, Matos turned and ran back to the store. After a brief chase, he was apprehended and arrested. At the time of the arrest, Matos had the registration for the blue Toyota station wagon, from which Cuevas had retrieved the cocaine, in his possession. Later that afternoon, Torres was placed under arrest near his home in Chelsea. B. The Search of Rodr guez' Storage Unit B. The Search of Rodr guez' Storage Unit _____________________________________ During the early evening hours of that same day, January 17, 1992, agents applied for and obtained a search warrant to search the storage unit at North Shore Storage rented by Rodr guez. Torres had a key to this unit, along with keys to the brown Cadillac, in his possession at the time of his arrest. Rodr guez also had a key to this storage unit on his key ring at the time of his arrest. The searching agents found a 1988 Ford Taurus car with New York license plates in the storage unit. Under the front -10- seat of the car, agents found National Car Rental documents dated January 11, 1992 in Cuevas' name. A search of the trunk area of the car revealed a secret compartment and two kilograms of cocaine. The search of Rodr guez' self-storage unit also produced a triple-beam scale, various packaging materials and a safe. When the safe was opened a few days later, agents discovered another kilogram of cocaine and more packaging materials. -11- C. Prior Proceedings C. Prior Proceedings _________________ On January 30, 1992, a grand jury returned a five-count indictment against Cuevas, Torres, Rodr guez, Matos, and Thomas. Count One charged all six with participating in a conspiracy to possess cocaine with intent to distribute. Counts Two through Five of the indictment contained substantive distribution charges relating to the four undercover cocaine purchases. Cuevas and Thomas were named as defendants in Counts Two, Three, and Four. Cuevas, Torres, Rodr guez and Matos were named as defendants in Count Five, regarding the ten kilogram transaction. After a trial, a jury returned guilty verdicts against all defendants on all counts. Rodr guez, Matos and Thomas were sentenced on December 8, 1992. The district court sentenced Thomas to 70 months' imprisonment. Based on their participation in the ten kilogram transaction of January 17, 1992, Rodr guez and Matos each received ten-year, mandatory minimum sentences. The district court sentenced Cuevas to 235 months' imprisonment, and Torres to 210-months' imprisonment. ANALYSIS ANALYSIS A. Denial of Torres' Motion for Severance A. Denial of Torres' Motion for Severance ______________________________________ Several months prior to trial, Torres filed a motion for severance under Fed. R. Crim. P. 14, arguing that his case should be severed because "one or more co-defendants has given or would give exculpatory testimony or evidence in his behalf if called as a witness at trial." His motion was unaccompanied by affidavit or other evidence of such a witness. Torres did, -12- however, submit an affidavit from Cuevas with a markedly different version of the events of January 17, 1992. Although Cuevas' affidavit attempted to exculpate Torres, nothing in the affidavit indicated whether he would actually testify on Torres' behalf. The district court rejected Torres' motion for severance, holding that Torres had not met his burden under United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984). _____________ _______ Immediately prior to jury selection for his trial, Torres filed a Supplemental Motion for Severance, arguing that severance was required on two grounds. First, he contended, a severance was required due to "prejudicial spillover." Second, Torres contended that a separate trial was required in order to make Cuevas' exculpatory testimony available to him. In his motion, Torres admitted that Cuevas' attorney had recently advised Torres' counsel that Cuevas would not testify on Torres' behalf at a separate trial. However, according to Torres, Cuevas had personally indicated to him that he would testify for Torres at a separate trial. Torres again failed, however, to produce any affidavits supporting this assertion. Torres requested that the court ask Cuevas directly of his intentions. Cuevas' counsel objected to such a procedure. The district court then declined to question Cuevas directly, found that the basis for Torres' severance motion was "entirely too speculative" and denied the motion. Torres now challenges the district court's denial of his motion. We have held that "[a] motion for severance is -13- committed to the sound discretion of the trial court, and we review only for a manifest abuse of discretion resulting in a miscarriage of justice." United States v. Welch, 15 F.3d 1202, _____________ _____ 1210 (1st Cir. 1993), cert. denied sub. nom, Driesse v. United ____ ______ ___ ___ _______ ______ States, 114 S. Ct. 1661 (1994) and Welch v. United States, 114 S. ______ _____ _____________ Ct. 1863 (1994). A trial judge thus has considerable latitude in deciding severance questions, and we will overturn that judge's resolution of them only if that wide discretion is plainly abused. United States v. O'Bryant, 998 F.2d 21, 25 (1st _____________ ________ Cir. 1993) (internal quotations omitted). Reviewing Torres' challenge under this standard, we find no abuse of discretion. 1. Severance to allow exculpatory testimony of a 1. Severance to allow exculpatory testimony of a _________________________________________________ codefendant codefendant ___________ Torres' motion for severance in order to allow exculpatory testimony by a codefendant is governed by our holding in Drougas, 748 F.2d at 19. Under the Drougas test, in order to _______ _______ be entitled to a severance on the basis of a codefendant's testimony, the movant must demonstrate 1) a bona fide need for __________ the testimony; 2) the substance of the testimony; 3) its exculpatory nature and effect; and 4) that the codefendant will in fact testify if the cases are severed. A court reviewing such a motion should 1) examine the significance of the testimony in relation to the defendant's defense theory; 2) consider whether the testimony would be subject to substantial, damaging impeachment; 3) assess the counterarguments of judicial economy; and 4) give weight to the timeliness of the motion. Id. at 19. __ Torres did not meet the fourth prong of the Drougas _______ -14- test -- i.e., he did not sufficiently establish that Cuevas would ____ indeed testify in a separate trial. Torres insists that Cuevas had repeatedly assured him that he would testify in his behalf, yet Torres did not submit any affidavits, either his own or Cuevas', in support of these assurances. More importantly, Cuevas' attorney told Torres and the district court specifically that Cuevas would not testify. Torres concedes now that "some ___ doubt remained" as to whether Cuevas would actually testify at a separate trial. He argues, however, that given this doubt, the district court should have asked Cuevas directly over counsel's objection whether he would testify at a separate trial on Torres' behalf, and that the court's failure to ask this "single, clarifying question" of Cuevas "crippled" Torres' defense and constituted an abuse of discretion. We have held that an allegation that a codefendant may testify, without more, is insufficient to entitle a defendant to severance. United States v. Nason, 9 F.3d 155, 159 (1st Cir. _____________ _____ 1993). Given the complete lack of either factual or legal support for Torres' request, it is clear to us that the district court's refusal to interrogate Cuevas directly was entirely reasonable and within its broad discretion.2 This lack of  ____________________ 2 The government suggests that because Cuevas had not waived his right to counsel, a forced inquiry of Cuevas by the court over ____ his attorney's objection may well have given rise to a claim by _________________________ Cuevas that his Sixth Amendment right to effective assistance of counsel had been compromised. While we do not opine on this possibility, such lurking constitutional concerns underscore the reasonableness of the district court's refusal to question Cuevas directly. -15- evidence also leads us to the inescapable conclusion that the district court properly applied the Drougas test and denied _______ Torres' severance motion on this ground. 2. Severance to avoid "prejudicial spillover" of 2. Severance to avoid "prejudicial spillover" of ________________________________________________ evidence evidence ________ Torres also claims that because he only played a "minor role" in the charged conspiracy and much of the evidence adduced at trial concerned the codefendants, he was unfairly prejudiced by the "spillover" of this evidence. "Spillover" occurs when evidence establishing guilt of one defendant, but not admissible against another, creates an "atmosphere clouding the jury's ability to evaluate fairly the guilt or innocence of the latter." United States v. Perkins, 926 F.2d 1271, 1281 (1st Cir. 1991). ______________ _______ We have explained, however, that where evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover. O'Bryant, 998 F.2d at 26. Furthermore, the existence of stronger ________ evidence against codefendants does not necessarily entitle a defendant to automatic severance, nor does a defendant's relatively minor conspiratorial role normally preclude a joint trial with more prominent codefendants. Welch, 15 F.3d at 1210. _____ Thus, when multiple defendants are named in a single indictment, a defendant who seeks severance will succeed only by making a "strong showing of evident prejudice." O'Bryant, 998 F.2d at 25. ________ Even where large amounts of evidence are irrelevant to one defendant, or where one defendant's involvement in an overall conspiracy is far less than that of others, a reviewing court -16- must be reluctant to second-guess severance denials. Id. at 26. __ In support of his "spillover" claim, Torres contends that the government's trial evidence actually proved two conspiracies, not one, as charged in the indictment. Torres maintains that the evidence proved one conspiracy involving Thomas and Cuevas that produced the three early cocaine transactions. He contends that the evidence then established a second conspiracy involving Cuevas, Rodr guez, Matos and himself to deliver the ten kilograms of cocaine on January 17, 1992. Torres argues that he was unfairly prejudiced by the evidence of the three smaller cocaine transactions among Agent Mart nez and defendants Thomas and Cuevas. Torres' defense counsel raised this objection repeatedly during trial, and the district court carefully instructed the jury with respect to the issue of multiple conspiracies. Torres did not object to this aspect of the district court's jury charge, and does not challenge it here. In any case, the evidence strongly indicates that Torres was much more than a one-day, one-time conspirator, as he now avers. During his conversations with Agent Mart nez, defendant Cuevas repeatedly stated that he needed to confer with his "partner." When introducing Torres, he referred to him as his "socio," or associate. Immediately before and after one of _____ his meetings with Mart nez negotiating a multi-kilogram transaction, Cuevas called Torres on his cellular telephone. The evidence also shows an ongoing relationship between Torres and -17- Rodr guez, and that Rodr guez was responding to Torres' page at the time of his arrest. We think that this evidence all fairly supports the reasonable inference that Torres was Cuevas' partner inanongoingdrug conspiracy,whichincludedthethree smallertransactions. Most importantly, the evidence introduced at trial firmly supports Torres' conviction for participating in a single conspiracy to distribute ten kilograms of cocaine on January 17, 1992. In fact, the evidence indicates that Torres had an influential, even leading, role in the conspiracy. He went with Cuevas in the morning to the storage facility where the cocaine was presumably stored; he actively participated in the discussions with Agent Mart nez, suggesting the place and mechanics of the transaction; and he stated that he had another smaller delivery that day. Torres has not indicated how he was prejudiced by any alleged "spillover," and in light of all the evidence against him, we do not see any prejudice. Accordingly, we affirm the district court's denial of his motion to sever. B. Admission of Co-Conspirator Statements against B. Admission of Co-Conspirator Statements against __________________________________________________ Torres Torres ______ Torres also maintains that the district court committed clear error when it admitted into evidence statements made by Thomas and Cuevas prior to January 17, 1992, under Fed. R. Evid. 801(d)(2)(E). In particular, Torres challenges the admission of the statements made by Thomas to Agent Mart nez during a recorded conversation on October 18, 1991. Torres claims that the statement should have been excluded because 1) United States v. _____________ Petrozziello, 548 F.2d 20 (1st Cir. 1977), requires that the ____________ -18- government have independent evidence that the defendant was a member of the conspiracy at the time the co-conspirator statement was made; 2) there was no significant evidence linking Torres to the conspiracy other than the challenged statement; and 3) the statement prejudiced him by "possibly rais[ing] an inference that Torres had any knowledge of or connection to the drug trafficking activities of Thomas and Cuevas before January 17, 1992." The test for admissibility of a coconspirator statement under Fed. R. Evid. 801(d)(2)(E) is whether, under a "preponderance of the evidence" standard, it is more likely than not that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of that conspiracy. United States v. ______________ Sep lveda, 15 F.3d 1161, 1180 (1st Cir. 1993) (citing, inter _________ _____ alia, Petrozziello, 548 F.2d at 23). A district court's rulings ____ ____________ on the admissibility of co-conspirator declarations are reviewed under the clearly erroneous standard. Id. at 1180. __ We have held that when a defendant joins a conspiracy ____ is irrelevant in determining whether a co-conspirator's statement is admissible under Rule 801(d)(2)(E). Once found to be a member of a conspiracy, a defendant is subject to proof of the prior acts and comments of his co-conspirators, even if those comments were made prior to the defendant's involvement in the conspiracy. United States v. Masse, 816 F.2d 805, 811 (1st Cir. 1987). In _____________ _____ the instant case, the district court conducted a Petrozziello ____________ hearing at the close of all the evidence, and concluded, by a -19- preponderance of the evidence, that a single conspiracy existed and that Torres was a participant. Nothing more was required under our precedents to render the statements of co-conspirators Thomas and Cuevas admissible under Rule 801(d)(2)(E). In light of the ample evidence, discussed above, of the existence of a conspiracy and Torres' influential participation in it, we cannot say that the district court's Petrozziello rulings were clearly ____________ erroneous. We therefore affirm Torres' conviction. C. Denial of Matos' Motion to Suppress C. Denial of Matos' Motion to Suppress ___________________________________ On March 17, 1992, Matos moved to suppress evidence seized by the government incident to his arrest on the grounds that his arrest was conducted without probable cause. Essentially, Matos claims that his arrest at the Sears store on January 17, 1992 was based on a mere hunch or subjective suspicion by the arresting agents that Matos and Rodr guez were conducting "counter-surveillance" for Cuevas' cocaine transaction. In a written memorandum and order, the district court denied Matos' motion, concluding that his arrest was supported by probable cause. The district court reviewed Matos' activities prior to his arrest, and noted that "[t]he fact that Matos fled adds weight to the determination of probable cause, but is not necessary to that determination." Matos now claims that we must find that the district court's denial of his suppression motion constituted reversible error. A district court's findings of fact on a motion to suppress are reviewable only for clear error as to probable -20- cause, and questions of law remain subject to de novo review. __ ____ United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).3 ______________ ______ Regardless of the degree of deference in our review, however, we believe that the district court was correct in finding that Matos' arrest was supported by probable cause. It is elementary that the constitutionality of a warrantless arrest depends upon whether, at the time the arrest _______________________ was made, the officers had probable cause to make it -- that is, ________ whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense. United States v. Morris, 977 F.2d 677, 684 (1st Cir. _____________ ______ 1992). Probable cause is determined under an objective standard, and the government need not show the quantum of proof necessary to convict. Id. Probability, and not a prima facie showing of __ criminal activity, is the standard of probable cause. Id.  __ We have held that probable cause must be determined in light of the collective knowledge of the law enforcement officers involved in an investigation. United States v. Diallo, 19 F.3d _____________ ______ 23, 25-26 (1st Cir. 1994). Accordingly, an officer's experience and expertise as a police officer may also be crucial factors in the probable cause determination. United States v. Maguire, 918 _____________ _______  ____________________ 3 Here, the district court ruled on Matos' motion without a hearing and did not make specific findings of fact. It is clear, however, that the court implicitly adopted the government's version of the facts. -21- F.2d 254, 258 (1st Cir. 1990), cert. denied sub. nom. Kavanaugh ____ ______ ____ ____ _________ v. United States, 501 U.S. 1234 (1991). _____________ Applying these principles here, we think it clear that an objective view of the facts support the district court's finding of probable cause for Matos' arrest. It was Rodr guez' storage unit that Cuevas and Torres accessed on the morning of January 17, 1992, a fact that the agents knew during their surveillance of Matos and Rodr guez that afternoon. The agents also had a reasonable suspicion that it had been Matos and Rodr guez in the blue Toyota station wagon who met with Torres and Cuevas at the storage facility that morning. The activities of Matos and Rodr guez that afternoon support a reasonable inference that they were closely involved in the delivery of ten kilograms of cocaine to Mart nez on January 17, 1992. Their behavior and carefully synchronized movements strongly support the agents' theory that they were in charge of counter- surveillance for the transaction. We therefore find that the district court correctly denied Matos' motion to suppress. E. Denial of Matos' and Rodr guez' Motions for Entry E. Denial of Matos' and Rodr guez' Motions for Entry __________________________________________________ of Judgments of Acquittal of Judgments of Acquittal ___ ______________________ Both Matos and Rodr guez challenge the district court's denial of their motions for judgments of acquittal. Matos contends that his "mere presence" at the scene of a crime is the only evidence of his membership in the conspiracy, and therefore that his conviction cannot stand. Rodr guez likewise contends that no evidence of his membership in the conspiracy exists, or -22- that he violated any laws, and that the government's case against him is based solely on conjecture and speculative inference. When reviewing the denial of a motion for judgment of acquittal, we assess the sufficiency of the evidence as a whole in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. United States v. Hahn, 17 F.3d 502, 506 (1st Cir. _____________ ____ 1994). The evidence may be entirely circumstantial, and need not exclude every reasonable hypothesis of innocence. In other words, the factfinder may decide among reasonable interpretations of the evidence. Id. __ Viewing the evidence according to these principles, we think it clear that the convictions of both Matos and Rodr guez were amply supported by the evidence. Both of these appellants' challenges rest on the testimony offered by Rodr guez at trial. Rodr guez testified at trial that he had rented a storage unit at North Shore Self Storage with Cuevas for the purpose of repairing a car. According to Rodr guez, he returned his keys and paperwork to Cuevas and did not return to the storage unit after December 19, 1991. Rodr guez also denied driving to the storage unit on the morning of January 17, 1992, denied returning to the Weylu's parking lot, denied running from the restaurant to his BMW with Matos, and denied following Mart nez and Cuevas to the Kowloon restaurant. Rodr guez claimed that his only contact with -23- Cuevas on that day was to drive him to Weylu's, after which he and Matos proceeded to Sears to go shopping. Rodr guez also denied that he was responding to a page from Torres when he was arrested, despite the records indicating that just moments before his arrest he had been paged by Torres. Clearly, the jury rejected Rodr guez' testimony, no doubt in light of the evidence to the contrary. As discussed above, the government proved through strong circumstantial evidence that Rodr guez and Matos were closely involved with Cuevas in the ten kilogram transaction. The jury was entitled to draw reasonable inferences from this evidence, and to reject Rodr guez' testimony in whole or in part. We therefore find that the evidence adduced at trial supports the jury's guilty verdict, and that the district court properly denied the defendants' motions for judgments of acquittal. F. The Sentences of Torres, Matos & Rodr guez F. The Sentences of Torres, Matos & Rodr guez __________________________________________ All of the appellants challenge their sentences. Torres, Rodr guez and Matos each challenge the drug quantity determinations made by the district court during sentencing. Torres claims that the district court committed clear error by attributing to him two kilograms of cocaine discovered in a second storage unit at North Shore Self Storage. Consequently, Torres argues, his Base Offense Level under the Sentencing Guidelines should have been 32 (5-15 kilograms of cocaine) rather than level 34 (15-50 kilograms of cocaine), as determined by the district court. -24- Rodr guez and Matos also claim that the district court committed clear error in finding that a drug quantity of at least five kilograms of cocaine was reasonably foreseeable to them as a consequence of their participation in the ten kilogram transaction of January 17, 1992. Accordingly, Rodr guez and Matos both claim that their ten-year mandatory minimum sentences must be vacated. It is well settled that "[a] narcotics conspirator is responsible not only for the drugs he actually handled or saw but also for the full quantity of drugs that he reasonably could have foreseen to be embraced by the conspiracy he joined." United ______ States v. De La Cruz, 996 F.2d 1307, 1313 (1st Cir.), cert. ______ ___________ ____ denied, 114 S. Ct. 356 (1993). Moreover, the district court's ______ finding as to the quantity embraced by the conspiracy and reasonably foreseen by the defendant is a factual one and will not be disturbed unless it is clearly erroneous. Id. In __ reviewing drug quantity determinations made by district courts, we have held that the sentencing court has broad discretion to determine what data is or is not sufficiently dependable to be used in imposing sentences. United States v. Whiting, 28 F.3d _____________ _______ 1296, 1304 (1st Cir. 1994) (internal quotations omitted). We also defer to the sentencing court's credibility determinations. Id.  __ 1. The district court's drug quantity determination 1. The district court's drug quantity determination ________________________________________________ as to Torres as to Torres ____________ The district court found Torres responsible for the ten kilograms involved in the January 17, 1992 transaction; three -25- kilograms found in Rodr guez' storage unit; and two kilograms found in another storage unit belonging to Mariquesa Cuevas.4 The district court based its sentencing determinations on its factual finding that Torres was "very much involved" in "what was going on out at the storage location," and that the evidence regarding his participation in the cocaine distribution scheme with Cuevas was compelling. The district court concluded, based on these findings, that Torres was "involved and accountable" for the five kilograms found in the two units at North Shore Self Storage. Torres now argues that no evidence links him to Mariquesa Cuevas' storage unit or to the two kilograms of cocaine found therein. He contends that the sentencing court had to engage in speculative and impermissible leaps of logic in order to attribute these two kilograms to him, and his sentence must therefore be vacated. The relevant facts relied upon by the district court during sentencing but not introduced into evidence at trial are as follows. During the afternoon of January 17, 1992, after Cuevas had been arrested, his sister Mariquesa attempted to enter North Shore Self Storage. She was driving Cuevas' gold Honda Accord, a car that Cuevas had driven to one of his meetings with Agent Mart nez. Mariquesa Cuevas was stopped by a state trooper before she could enter the storage facility premises. The  ____________________ 4 Mariquesa Cuevas, the sister of defendant Abelardo Cuevas, did not appear for trial and is a fugitive from justice. The two kilograms of cocaine found in her storage unit on January 17, 1992 were therefore not introduced at trial. -26- officer observed a large amount of cash on the back seat of the Honda. When asked about the money, Mariquesa Cuevas said that she knew nothing about it, and that the car belonged to her brother. The car, the money (approximately $7,000) and the car keys were then seized. Later that evening, agents obtained and executed a search warrant for a storage unit leased in the name of Mariquesa Cuevas, as well as the unit leased in Rodr guez' name. Two kilograms of cocaine were recovered from Mariquesa Cuevas' unit. Agents later determined that one of the keys on the gold Honda's key ring fit the lock to Mariquesa Cuevas' storage unit. The district court evidently found Torres responsible at sentencing for these two kilograms because of the ample circumstantial evidence of his close, influential association with Cuevas, and the fact that Torres had the key to Rodr guez' storage unit in which three kilograms of cocaine were found. Despite Torres' protestations at sentencing, the court faced a sizeable quantity of evidence that Torres exerted a significant, even a leading, role in a cocaine distribution conspiracy, and that use of the storage units at North Shore Self Storage was part of the conspiracy's mechanics. Therefore, even if Torres did not know specifically about the two kilograms in Mariquesa Cuevas' storage unit, the district court acted well within the bounds of its discretion in concluding, based on its factual findings, that Torres could have reasonably foreseen that any additional cocaine found in the storage unit would be deemed -27- "embraced" by the overall conspiracy. Torres fails to point to any competent evidence that contradicts the district court's findings and conclusions, other than his own testimony. Because the district court was entitled to disbelieve Torres' testimony, and because we cannot say that the court's findings of fact and conclusions were clearly erroneous, we reject Torres' challenge and affirm his sentence. 2. The district court's drug quantity calculations 2. The district court's drug quantity calculations ________________________________________________ as to Rodr guez and Matos as to Rodr guez and Matos _________________________ Rodr guez and Matos also argue that the ten kilograms of cocaine delivered to Agent Mart nez on January 17, 1992 should not have been attributed to them. They contend that the government failed to establish that they had the requisite knowledge of the the amount of cocaine involved in the conspiracy. Accordingly, they argue, the ten-year mandatory minimum penalty prescribed by 21 U.S.C. 841(b)(1)(A)(ii), applicable to conspiracies involving five or more kilograms of cocaine, does not apply to them. In rejecting this argument at sentencing and ruling that the ten-year mandatory minimum did indeed apply, the district court found by a preponderance of the evidence that Rodr guez and Matos joined Cuevas and Torres in the morning of January 17, 1992 to pick up the ten kilograms of cocaine from the storage facility to sell to Agent Mart nez. The evidence adduced at trial, moreover, also indicates that it was Rodr guez and Matos who, at Cuevas' instruction, moved the ten kilograms of cocaine from Weylu's restaurant to the Kowloon restaurant later -28- that day. When Rodr guez' storage unit was searched that evening, a car with a secret compartment and three kilograms of cocaine were found. Rodr guez had a key to this unit at the time of his arrest. In light of all of this evidence and the reasonable inferences that can be drawn therefrom, we cannot say that the district court committed clear error in finding that a drug quantity of at least five kilograms was reasonably foreseeable to both Rodr guez and Matos. We have previously explained that "[a] defendant who conspires to transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount involved will be quite large." De La Cruz, 996 F.2d at 1314. We see no reason or special ___________ circumstances here to justify a departure from our prior ruling. Accordingly, we reject Rodr guez' and Matos' challenges to their ten-year minimum mandatory sentences, and affirm the district court's ruling.5 CONCLUSION CONCLUSION For the foregoing reasons, the convictions and sentences of appellants Torres, Rodr guez, and Matos are affirmed. ________  ____________________ 5 Rodr guez and Matos also contend that the district court erroneously refused to consider their requests for downward departures. Because we have affirmed the district court as to their ten-year mandatory minimum sentences, their arguments regarding downward departures are moot, and we therefore need not address them. -29-